## In re GALILEO CORPORATION SHAREHOLDERS LITIGATION

### No. C.A. 98–12129–RCL.

United States District Court, D. Massachusetts.

Jan. 22, 2001.

Michael G. Lange, Jeffrey C. Block, Berman, DeValerio & Pease, Kathryn A. McElroy, Berman, Devalerio & Pease LLP, Boston, MA, Michael J. Pucillo, Burt & Pucillo, LLP, West Palm Beach, FL, Nancy Freeman Gans, Moulton & Gans, LLP, Stephen Moulton, Moulton & Gans, Boston, MA, for Perkins Partners I Ltd., on behalf of itself and all others similarly situated, Joseph Brecher, Individually and on behalf of all others similarly situated, Jason Steagall, on behalf of himself and all others similarly situated, Marion Dwyer, on behalf of herself and all others similarly situated, Plaintiffs.

Michael T. Gass, Peter S. Terris, Palmer & Dodge, John E. Tener, Robinson & Cole, Boston, MA, James R. Hawkins, II, Finn Dixon & Herling LLP, Stamford, CT, for Gregory Riedel, Galileo Corporation, William T. Hanley, Defendants.

Glen DeValerio, Michael G. Lange, Berman, DeValerio & Pease, Boston, MA, for Glen Katz, Michael Sclafani, Chin Luu, Ted Walker, Plaintiffs.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS

LINDSAY, District Judge.

### I. *Introduction*

This is a consolidated securities fraud action, in which the plaintiffs allege a plaintiffs' class consisting of all persons who purchased common stock of the defendant, Galileo Corporation ("Galileo"), during the period from January 28, 1998 through July 23, 1998 (the "class period"). The defendants are Galileo; William T. Hanley ("Hanley"), who was president, chief executive officer and a director of Galileo from 1984 until October 29, 1998;

and Gregory Riedel ("Riedel"), who was Galileo's vice president of finance and chief financial officer from 1996 until October 29, 1998.

The consolidated amended class action complaint ("amended complaint"), in count I, alleges violations by the defendants of Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b); and Rule 10b–5, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"), promulgated under the Exchange Act by the Securities and Exchange Commission ("SEC"). Count II alleges violations by the defendants of Section 20(a) of the Exchange Act. The plaintiffs complain that, prior to and during the class period, the defendants violated these provisions of the securities laws and regulations by (1) making false and misleading statements that touted the positive impact on Galileo's business of a certain product distribution agreement; (2) making or failing to make certain adjustments in Galileo's financial statements, with the result that those financial statements were false or misleading in reflecting Galileo's financial condition; and (3) omitting to disclose the negative impact on one of Galileo's divisions of certain export restrictions imposed by the United States government. The plaintiffs claim that when the truth about Galileo's operations and financial condition (theretofore hidden by the defendants' false or misleading statements) was revealed, the price of Galileo's stock fell substantially, and the decline caused injury to the plaintiffs.

The defendants, pursuant to Fed. R.Civ.P. 12(b)(6) ("Rule 12(b)(6)"), have moved to dismiss the amended complaint on the ground that the plaintiffs have failed to meet the strict pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4, and of Fed.R.Civ.P. 9(b) ("Rule 9(b)").

### II. *Factual Allegations*

The amended complaint alleges the following.

In February 1997, Galileo was notified by its largest customer, Xerox Corporation ("Xerox"), that Xerox would no longer purchase products called dicorotron assemblies from Galileo, because Xerox had developed in-house capacity to produce those products.[1] Sales to Xerox had accounted for $20.4 million or 48% of Galileo's 1996 total sales. Thereafter, in an effort to recover revenues lost from sales to Xerox, Galileo acquired four medical products companies between February, 1997 and February, 1998. Galileo publicly represented that these acquisitions would result in $25 million in new revenues for the fiscal year 1998. In addition, Galileo claimed that its Endoscope and Scientific Detector and Remote Spectroscopy divisions, together with the new acquisitions and Galileo's telecommunications products, would be business lines that would rehabilitate Galileo from the impact of the loss of sales to Xerox.

On October 29, 1997, Galileo announced the results of its operations for the fourth quarter ending September 30, 1997. In that announcement, Hanley stated:

> We are pleased with our fourth quarter progress in replacing revenues resulting from our lost Xerox business. We are executing our plan to develop our medical and telecommunications businesses highlighted this quarter by events described in our recent announcements regarding the acquisition of Leisegang Gmbh and new medical business customers and products ... [D]emonstrating this progress, excluding sales to Xerox [,] our fourth quarter revenue increased 46% from the comparable prior year period and 9% from our 1997 third fiscal quarter [,] principally from new product revenues.

*Amended Complaint* at ¶ 25.

In its annual report for the fiscal year ending September 30, 1997, filed on SEC form 10–K, Galileo described its scientific

detector and spectroscopy products as accounting for 37% of net sales. Sales of endoscope imaging devices were reflected as part of Galileo's medical products division. That division also included sales through Leisegang Medical, Inc. ("Leisegang"), one of Galileo's newly-acquired subsidiaries and a company that primarily manufactured and distributed women's health-related medical products. With regard to its telecommunications products, the 1997 10–K stated that Galileo was developing new technology that Galileo had designed, tested and manufactured, and that Galileo was actively marketing this technology, having already delivered several prototypes to prospective customers.

### A. *First Quarter of Fiscal Year 1998*

On January 28, 1998, Galileo publicly released its results of operations for the first quarter ending December 31, 1997. The company reported a loss of $1,111,000 on revenues of $8,563,000 for the quarter, down from $9,711,000 in revenues for the first quarter of the prior year. In his remarks on first quarter 1998 revenues and earnings, Hanley stated:

> We are pleased with the operational progress we've made during our first quarter. We have successfully integrated our newly-acquired Leisegang operations in Germany, and we are very excited about the imminent closing of our recently announced acquisition of OFC Corporation. These acquisitions, combined with internal revenue growth, have replaced all of the revenues lost from our relationship with Xerox.

*Amended Complaint* at ¶ 28.

On February 13, 1998, Galileo filed its quarterly report, on SEC form 10–Q, for the first quarter 1998. That report confirmed the figures in Galileo's January 28 release.

---

**1.** Although the amended complaint describes various lines of business in which Galileo engaged during the class period, the amended complaint does not give a description of the nature of Galileo's business overall.

The plaintiffs allege that the January 28 release and Galileo's first quarter 10–Q were false or misleading because the defendants had improperly recognized more than $400,000 in revenues from sales booked to Imagyn Medical Technologies, Inc. ("Imagyn"), a customer then suffering financially. The plaintiffs allege that Galileo, to the defendants' actual or constructive knowledge, had no reasonable prospect of collecting the Imagyn revenues that were recognized in the first quarter 1998 and reported in the January 28 release and in the February 13, 1998 10–Q [2]. The plaintiffs assert that had Galileo complied with generally accepted accounting principles ("GAAP") and not recognized the revenues from the Imagyn sales, the actual loss in the first quarter would have been much greater than that shown in the 10–Q for the first quarter 1998. The plaintiffs also allege that the first quarter 10–Q was false or misleading, because it stated that the financial statements fairly presented Galileo's financial position and the results of Galileo's operations and cash flows for the three-month period ending December 31, 1997 in conformity with GAAP.

## B. Second Quarter of Fiscal Year 1998

### 1. The Physician Sales Agreement

On March 10, 1998, in an article appearing in a publication called *Mass Tech. Times*, Hanley was quoted as saying that Galileo's medical products division was fast-growing and that Galileo intended to invest in that business to recover from the loss of the Xerox business.

On March 19, 1998, Galileo announced, in a press release, that it had signed a five-year supply and distribution agreement with a company called Physician Sales for the distribution of certain women's health, diagnostic and surgical products. Galileo described this agreement as a major source of revenue for the company over the next five years, which would have a significant impact on Galileo's revenues in the first year. The release stated:

> The agreement covers distribution to physicians' offices and other office-based health care providers throughout the United States and includes purchase requirements to retain exclusivity to certain Leisegang products of over $150 million for the five years with a first year minimum requirement of $25 million.

*Id.* at 34.

The plaintiffs assert that the press release was materially misleading because it did not state that it contained forward-looking statements and did not contain cautionary language that Galileo might not achieve the "substantial" one-year and five-year revenue goals. *Id.* Furthermore, the plaintiffs allege, the release was materially misleading because the defendants did not disclose that Galileo could not enforce the minimum purchase requirements of the agreement, and did not disclose that the agreement contained no monetary penalty if Physician Sales failed to satisfy the minimum purchase requirements. Finally, the plaintiffs allege that the release was materially misleading, because there was no reasonable prospect that Physician Sales would sell office-based health-care providers $25 million of women's health products in the first year of the agreement or $150 million in five years, and because the defendants failed to disclose that Galileo's medical products division was not fast-growing or promising, given problems with a customer called Sofamor Danek, described below.

Following the March 19 release, Galileo's stock prices increased from approximately $10.50 per share to $17.50 per share. *Id.* at 36.

On April 28, 1998, Galileo issued another release reporting record revenues of $11,866,000 for the second quarter ending

---

**2.** The reasons the plaintiffs assert as to why the plaintiffs knew or recklessly disregarded the poor prospects of collecting the Imagyn revenues are explained *infra* in part II(B)(3).

March 31, 1998. *Id.* at 37. Even so, the release reported a loss of $704,000 for that quarter. *Id.* In the release, Hanley remarked that "internal and acquisition-related growth has successfully replaced all of the revenues lost from our Xerox relationship." *Id.*

On May 15, 1998, Galileo filed its 10–Q for the second quarter ending March 31, 1998. That report confirmed the financial information released on April 28. The plaintiffs allege that the second quarter 10–Q was misleading for, among other things, all the reasons that the March 19, 1998 press release was misleading, including an overstatement of revenues earned that quarter.

## 2. *Sofamor Danek Sales*

In October 1997, Galileo announced the signing of what it described as a significant multimillion dollar supply agreement for flexible endoscopes and accessory devices.[3] The initial order, made pursuant to this agreement, was valued by Galileo at more than $1 million. The customer with whom the supply agreement was made, although never publicly identified, was a company called Sofamor Danek.

Revenues from endoscope sales to Sofamor Danek first appeared in Galileo's results of operations for the first quarter, 1998. These results were announced on January 28, 1998, the beginning date of the class period. By the second quarter, during February or March 1998, however, Sofamor Danek had returned, as defective, approximately $800,000 worth of the endoscopes involved in the supply agreement. Because Galileo decided to repair or replace the defective products, the plaintiffs allege, Galileo was required to record, in the second quarter, a warranty reserve or a charge against revenues from the sale of the endoscopes, to account for the estimat-

ed costs of repair or replacement of the endoscopes. The plaintiffs allege that the defendants did not disclose that the endoscopes had been returned by Sofamor Danek and did not establish a timely reserve or charge for the anticipated cost of replacing or repairing them, thereby causing Galileo's financial results for the second quarter to be materially false or misleading. Part of the revenue recorded from sales to Sofamor Danek was charged off after the class period.

## 3. *Sales to Imagyn*

Galileo's 10–Q for the second quarter 1998 also included, as revenue, approximately $500,000 from endoscope sales to Imagyn. The plaintiffs claim that, when added to the amount recognized in the first quarter, *see supra* part II(A), the second quarter 10–Q brought to about $900,000 the total Imagyn revenues that had been improperly recognized and reported in the first two quarters of 1998.

The plaintiffs allege that both Hanley and Riedel had known since November 1997 that Imagyn was in serious financial trouble and having difficulty paying its bills. The plaintiffs contend that "Riedel had been in regular contact with Imagyn during the first quarter . . . and knew that payment from Imagyn could not be reasonably assured." *Id.* at 48. Nevertheless, the plaintiffs assert, Riedel approved the reporting of revenues from sales to Imagyn in both the first and second quarters of 1998.

The plaintiffs allege further that both Hanley and Riedel knew or recklessly disregarded the extent to which collection of the Imagyn receivables was in doubt because facts regarding Imagyn's financial condition were publicly available during the first and second quarters of 1998. The plaintiffs claim that such publicly-available

---

**3.** Hanley stated in the press release concerning this agreement:

> This order is a key indicator of our rapidly expanding medical products business and enhances our reputation as a reliable inde-

pendent manufacturer of custom designed application-specific endoscopes which provide unique solutions to today's medical challenges.

*Id.* at ¶ 43.

facts put Riedel and Hanley on notice (even without individual discussions with Imagyn about its financial problems) that the collection of the $900,000 of recorded revenue from sales to Imagyn was in substantial doubt.

### 4. *Miscellaneous Revenue*

The plaintiffs allege that during the second quarter of 1998, Galileo also recorded $393,000 in revenues from sales of products to customers, other than Imagyn and Sofamor Danek, which revenues, the plaintiffs complain, were not recordable under GAAP. This improper revenue recognition later required a restatement of second quarter results and increased Galileo's losses for that quarter.

### 5. *Export Restrictions*

Galileo's scientific detector business also was expected to generate substantial revenues. The plaintiffs allege, however, that by the end of the second quarter, both Hanley and Riedel knew that the United States was restricting the foreign export of Galileo's microchannel plate products. The sale of scientific detector and spectroscopy products abroad was a large part of Galileo's business, and microchannel plate products were critical components of Galileo's scientific detector and spectroscopy products. The plaintiffs claim that the defendants knew or recklessly disregarded that export restrictions would have an adverse effect on Galileo's revenues in the second quarter and beyond. In fact, the plaintiffs claim, the defendants frequently sent Robert White, the general manager of Galileo's Scientific Detector Division, to Washington, D.C. during the second quarter to meet with federal officials on the issue of export restrictions. The plaintiffs allege that the defendants did not disclose, before July 23, 1998, the actual and potential loss of sales due to the export restrictions.

### C. *The July 23, 1998 Release*

On July 23, 1998, Galileo reported the results of its operations for the third quarter ending June 30, 1998. The plaintiffs allege that this release revealed for the first time that many of Galileo's earlier financial statements concerning the first and second quarters had been materially false or misleading. In the release, Galileo reported a loss of $3,330,000. The loss "was attributed in part to a provision for $984,000 ... principally related to the potential uncollectability of receivables from a significant medical endoscope customer that has recently experienced severe liquidity issues." *Id.* at ¶ 58. (quoting the release). The customer referred to was Imagyn. *Id.*

The release also disclosed that the medical endoscope business, which had been described as a key component in replacing lost revenues from Xerox, would be eliminated in the fourth quarter, and that Galileo would record charges of $3.7 million to reduce the carrying value of related equipment in inventory. The plaintiffs allege that, to the extent that the inventory charges related to the Sofamor Danek returns, some or all of these charges should have been recorded in the second quarter of 1998, when the defective products were returned to Galileo by Sofamor Danek. Finally, the release disclosed a loss of $800,000 in revenues for the third quarter due to the export restrictions.

The plaintiffs allege that the market's reaction to the July 23 release (a decline of 64% in Galileo's common stock price, with 1.3 million shares trading at the close of trading on July 24, 1998) demonstrated the extent to which the shareholders had been unaware of the true financial position of Galileo during the first and second quarters of 1998. The plaintiffs assert that, because Hanley's and Riedel's public statements about Galileo's turnaround during the first and second quarters of 1998 had been so positive, the plaintiffs did not suspect that the medical endoscope business would be completely abandoned, that close

to $1 million in sales recorded in the first and second quarters would be written off in the third quarter, or that there would be a loss of revenue in the scientific detector business as a result of the export restrictions.

## D. *The Restatement*

In October, 1998, the plaintiffs allege, investors discovered that the representations concerning Galileo's second quarter results of operations for 1998 were worse than the July 23 release had indicated. On October 29, 1998, Galileo announced that $393,000 in sales of products had been improperly recognized in the second quarter and should have been recorded as revenue in the third quarter. Riedel, the plaintiffs claim, had improperly recorded the $393,000 as revenue before the sales generating the revenue were completed. According to the plaintiffs, this improper revenue recognition was unrelated to the improper revenue recognition regarding Imagyn sales.

The restatement of Galileo's second quarter results reduced Galileo's revenues for that quarter and increased its net loss to $896,000. The plaintiffs say that when the board of directors of Galileo discovered that Riedel had not been reporting Galileo's results of operations in a manner consistent with GAAP, the directors terminated Riedel's employment. In addition, the October 29, 1998 release revealed that Hanley had resigned from the board, but continued to act as president and chief executive officer. In fact, the board terminated Hanley shortly after October 29, 1998.

## E. *Allegations Concerning Scienter*

The plaintiffs allege that, in making each of the materially false or misleading statements in press releases in other public announcements and in financial statements (including statements and reports filed with the SEC), the defendants acted with knowledge that the statements were false or acted in reckless disregard of whether the statements were true or false. By virtue of their positions in management, their active involvement in the preparation of financial statements, their knowledge of customers to whom sales were made, their discussions and negotiations with Imagyn regarding the latter's financial problems, their involvement with the repair and replacement of the endoscopes sold to Sofamor Danek, and their involvement in and knowledge of discussions with agencies of the federal government concerning the export restrictions on microchanel plates, Hanley and Riedel, the plaintiffs claim, fully were aware of, or recklessly disregarded, facts that rendered the various statements referred to in part II(A) and (B) of this memorandum and order false or misleading. The plaintiffs allege further, as to scienter, that Hanley and Riedel were motivated to make false or misleading statements about the financial condition of Galileo by their desire to use Galileo's common stock as currency for acquisitions of revenue-producing businesses.

## III. *Analysis*

### A. *The Pleading Standards*

Both counts of the amended complaint arise from what the plaintiffs say are violations by the defendants of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated by the SEC thereunder. Section 10(b) and the related rule prohibit the use of false or misleading statements, or any other deceptive or manipulative device, in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. As noted earlier, the defendants have moved, under Rule 12(b)(6), to dismiss the amended complaint.

In considering a motion to dismiss a complaint under Rule 12(b)(6), the court must "accept as true all well-pleaded allegations and give the plaintiffs the benefit of all reasonable inferences." *Cooperman v. Individual, Inc.,* 171 F.3d 43, 46 (1st Cir.1999). The court may grant the motion "only if 'it appears beyond doubt that

the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *In re Peritus Software Services, Inc.*, 52 F.Supp.2d 211, 217 (D.Mass.1999) (quoting *Roeder v. Alpha Indus.*, 814 F.2d 22, 25 (1st Cir.1987)).

Notwithstanding any of the foregoing, however, a plaintiff alleging securities fraud must meet the pleading requirements of the PSLRA and Rule 9(b) in order to survive a Rule 12(b)(6) motion. The purpose of the PSLRA and that statute's pleading requirements and the pleading requirements of Rule 9(b) thus warrant further comment here.

Congress enacted the PSLRA, which amended the Securities Act of 1933 and the Exchange Act, in a bipartisan effort to curb abuse in private securities litigation, especially the filing of so-called strike suits.[4] *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 191 (1st Cir.1999); H.R. Conf. Rep. No. 104–369, at 32 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 731. In particular, Congress sought to reform private securities litigation to discourage unmeritorious class actions, including actions brought because of a decline in stock prices. *See* H.R. Conf. Rep. No. 104–369 at 32 (1995), *reprinted* in 1995 U.S.C.C.A.N. 730, 731. The aims of the PSLRA are three-fold: "(1) to encourage the voluntary disclosure of information by corporate issuers; (2) to empower investors so that they—not their lawyers—exercise primary control over private securities litigation; and (3) to encourage plaintiffs' lawyers to pursue valid claims and defendants to fight abusive claims." S.Rep. No. 104–98, at 4 (1995), *reprinted* in 1995 U.S.C.C.A.N. 679, 683.

The PSLRA seeks to curtail the filing of abusive lawsuits at the pleading stage of litigation by establishing uniform and stringent pleading requirements. *See id.* at 15, *reprinted* in 1995 U.S.C.C.A.N. at 694. Accordingly, the PSLRA sets those rigorous standards of pleading, both for the false or misleading and the scienter elements of a securities fraud claim. Under the PSLRA, a complaint alleging securities fraud must set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Furthermore, to allege scienter sufficiently, the complaint must, "with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at § 78u–4(b)(2); *see also, Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 231 (D.Mass.1999); *Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 274–75 (D.Mass.1998). If the complaint does not meet these statutory pleading requirements, dismissal is required. *See* 15 U.S.C. § 78u–4(b)(3)(A).

Even before the enactment of the PSLRA, the First Circuit had been especially demanding in applying the heightened pleading requirements of Rule 9(b) in securities fraud cases so as "'to minimize the chance that a plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in the hopes of obtaining an increased settlement, rather than in the hopes that the process will reveal relevant evidence.'" *Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir.1998) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1223 (1st Cir.1996)); *see also, Romani v. Shearson, Lehman, Hutton*, 929 F.2d 875, 878 (1st Cir.1991). Recently, the First Circuit has addressed how the PSLRA has affected the circuit's treatment of the pleading requirements in securities cases under Rule 9(b). *See Greebel v. FTP Software, Inc.*, 194 F.3d at 193

---

**4.** A "strike suit" is a "suit (esp. a derivative action), often based on no valid claim, brought either for nuisance value or as leverage to obtain a favorable or inflated settlement." BLACK'S LAW DICTIONARY, 1448 (7th ed.1999).

(1st Cir.1999). In *Greebel*, the court concluded that the "PSLRA's pleading standard is congruent and consistent with the pre-existing standards of this circuit." *Id.* Thus, in this circuit, a complaint alleging securities fraud "must specify (1) the statements that the plaintiff contends were fraudulent, (2) the identity of the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent." *Peritus Software*, 52 F.Supp.2d at 219; *see also Suna v. Bailey Corp.*, 107 F.3d 64, 67 (1st Cir.1997). Further, "plaintiffs who bring their claims on information and belief [must] 'set forth the source of the information and the reason for the belief.'" *Greebel*, 194 F.3d at 194 (quoting *Romani*, 929 F.2d at 878).

As to scienter, this circuit has required under Rule 9(b), as the PSLRA now requires, that the plaintiffs "allege facts that give rise to a strong inference of fraudulent intent." *Maldonado*, 137 F.3d at 9 n. 5 (observing that the standard for pleading scienter under the PSLRA does not differ from that which the First Circuit "has historically applied," citing *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir. 1992)); *Suna*, 107 F.3d at 68 ("to serve the purpose of Rule 9(b), we require plaintiffs to allege facts that give rise to strong inference of scienter"); *but see Greebel*, 194 F.3d at 197 (noting that pre-PSLRA case law of the First Circuit "had used the language of both 'strong inference' and of 'reasonable inference' in various contexts."). Accordingly under PSLRA and Rule 9(b) caselaw in this circuit, "[a] mere reasonable inference [of scienter] is insufficient to survive a motion to dismiss." *Greebel*, 194 F.3d at 196–97. To survive a motion to dismiss the inference of scienter must be both reasonable *and strong. See id.* at 196.

■ The requisite scienter in a securities fraud case is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In this circuit, the scienter requirement may also be met by a showing of conduct that amounts to recklessness, defined as:

> a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.

*Greebel*, 194 F.3d at 198 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977)). Recklessness "'come[s] closer to being a lesser form of intent than merely a greater degree of ordinary negligence.'" *Id.* at 199 (quoting *Hoffman v. Estabrook & Co.*, 587 F.2d 509, 515–16 (1st Cir.1978)). However, "[e]ven if plaintiffs wish to prove scienter by 'recklessness,' they still must allege, with sufficient particularity, that the defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *Maldonado*, 137 F.3d at 9 n. 4; *see also In re PLC Systems, Inc.*, 41 F.Supp.2d 106, 114 (D.Mass.1999). Therefore, the pleading of scienter is insufficient if it merely is "a general averment that the defendants 'knew' earlier what later turned out badly." *Peritus Software*, 52 F.Supp.2d at 223 (quoting *Greenstone*, 975 F.2d at 25). Nor is scienter pleaded sufficiently by an allegation that a defendant "must have had knowledge of the facts," *Maldonado*, 137 F.3d at 9–10 (quoting *Greenstone*, 975 F.2d at 26); or by an allegation that the defendants must have known the facts solely by virtue of their positions with the issuer of the securities, *see Peritus Software*, 52 F.Supp.2d at 227–8; *Lirette*, 27 F.Supp.2d at 283; or by an allegation that the defendants must have known the facts because they were privy to internal corporate information not specified in the complaint. *Id.*

B. *Application of Pleading Standards to Plaintiffs' Amended Complaint*

■ The parties disagree as to the approach the court should take in analyzing the several allegations of securities fraud in this case. The plaintiffs argue that the court should consider the allegations in the aggregate—an approach which the plaintiffs say will reveal a pattern of fraud on the part of the defendants. The defendants say that each allegation of securities fraud must stand on its own and separately must meet the requirements of the PSLRA and Rule 9(b).

The defendants have the better of this argument: the plaintiffs' position simply is at odds with caselaw in this circuit. Our law requires that the court consider each of the plaintiffs' allegations separately:

> Case after 10b–5 case has been decided by a statement-by-statement analysis in which the inquiry made is restricted to the immediate context of each statement—namely, the balance of what was said on the particular occasion, and the immediate circumstances in which the particular statement was made.... It is not the law that a 10b–5 complaint is to be judged on the basis of the general flavor derived from an issuer's collective statements over a long period of time.

*In re Boston Tech. Inc. Sec. Litig.*, 8 F.Supp.2d 43, 55–56 (D.Mass.1998); *see also, e.g., Shaw*, 82 F.3d at 1219–21; *Capri Optics Profit Sharing v. Digital Equip. Corp.*, 950 F.2d 5, 7–11 (1st Cir.1991). Accordingly, I will evaluate separately the several statements of the defendants claimed by the plaintiffs here to have been false or misleading and made with the requisite scienter.

1. *Count I—Violations of Section 10(b) and Rule 10b–5*

■ Although the defendants make other arguments, the present motions to dismiss the amended complaint primarily are based on the claim that the plaintiffs have failed to meet the rigorous pleading requirements—particularly the requirements for pleading scienter—of the PSLRA and Rule 9(b). To repeat what has been said above, to satisfy the pleading requirement for scienter, the amended complaint must state with particularity facts giving rise to a strong inference that the defendants acted with intent to deceive, manipulate or defraud or, at the least, acted recklessly. *See Hochfelder* 425 U.S. at 193 n. 12, 96 S.Ct. 1375; *Greebel*, 194 F.3d at 198–99. Non-specific allegations concerning a defendant's state of mind are not enough.

a. *Imagyn Sales*

■ The plaintiffs allege that Galileo's first and second quarter forms 10–Q and the defendants' other public reports about Galileo's first and second quarter operating results were false or misleading because the defendants improperly recognized in those reports more than $900,000 [5] in revenues from endoscope sales to Imagyn. At the time the accused statements were made, the plaintiffs say, the defendants knew or recklessly disregarded that Galileo had no reasonable assurance that the Imagyn receivables were collectible. For reasons shortly to be explained, I conclude that in making this allegation, the plaintiffs have not met the requirement under the PSLRA and Rule 9(b) that they state with particularity facts giving rise to a strong inference that the defendants acted with conscious intent to deceive or acted recklessly.

The plaintiffs allege that Hanley and Riedel had known since November 1997 that Imagyn was in such financial difficulty that it was having trouble paying its bills. Specifically, the amended complaint alleges:

> properly included more than $500,000 in revenue attributable to endoscope sales to Imagyn.

---

5. The plaintiffs allege that Galileo's first quarter 10–Q improperly included over $400,000 in revenue from endoscope sales to Imagyn, and that its second quarter 10–Q, Galileo im-

Both defendants Hanley and Riedel had known since November, 1997, that Imagyn was in serious financial difficulties and was having trouble paying its bills. Riedel had been in regular contact with Imagyn during the first quarter (ending December 31, 1997), and knew that payment from Imagyn could not be reasonably assured. Nevertheless, Riedel, as the Company's Chief Financial Officer, approved the reporting of revenues from sales to Imagyn in both the first and second quarters of 1998 with full knowledge (or reckless disregard for the fact) that collection of the account receivables from Imagyn could not be reasonably assured.

*Amended Complaint* at ¶ 48. In addition, the plaintiffs assert that Hanley and Riedel were aware of—or recklessly disregarded—the extent to which collection of the Imagyn receivables was in doubt because of "publicly-available facts" about Imagyn's financial condition during the first and second quarters of 1998. The plaintiffs claim that the existence of these facts put Hanley and Riedel on notice that collection of the Imagyn receivables was in serious doubt.

The plaintiffs also contend that the following circumstances are indicative of fraudulent intent on the part of the defendants with respect to the reporting of the Imagyn revenues on Galileo's form 10–Q for the first two quarters of 1998:(1) a violation of GAAP by the defendants in recognizing revenues from the Imagyn sales and (2) a violation of Galileo's revenue recognition policy regarding the evaluation of the financial condition of customers to which it extends credit.

The plaintiffs first claim that a strong inference of scienter arises from the allegation in the complaint that "[b]oth defendants Hanley and Riedel had known since

November, 1997 that Imagyn was in serious financial difficulties and was having trouble paying its bills." *Id.* No specific facts are alleged about the nature or source of Hanley's actual knowledge. The complaint does allege, however, that Riedel "had been in regular contact with Imagyn during the first quarter (ending December 31, 1997), and knew that payment from Imagyn could not be reasonably assured." *Id.* It appears, then, that what the plaintiffs argue—in part by explicit allegation and in part by inference—is that, based on his discussions with Imagyn during the first quarter of fiscal year 1998, Riedel had actual knowledge of Imagyn's serious financial condition, and that, he and Hanley must have discussed what Riedel had learned from his regular contacts with Imagyn. *See Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss* at 18 n. 10.

The difficulty for the plaintiffs arises at the outset, with the allegation concerning Riedel's "regular contacts with Imagyn." Except in conclusory fashion, the amended complaint does not connect Riedel's contacts with Imagyn to any specific intelligence he gathered concerning Imagyn's financial condition during the first quarter 1998.[6] Nothing is alleged to identify the persons at Imagyn with whom Riedel was in contact, when those contacts occurred, the nature of the information imparted to Riedel during those contacts, or why the information Riedel obtained caused him to appreciate that payment to Galileo of Imagyn's receivables was not reasonably assured. What is missing from these allegations, in sum, is the kind of essential detail necessary to give rise to a *strong* inference that, to the extent Riedel participated in the preparation of the forms 10–Q for the first and second quarters of 1998, he acted with intent to deceive or that he acted

6. All the amended complaint says in effect is that Riedel was in regular contact with Imagyn "and knew that payment could not be reasonably assured." *Amended Complaint* at ¶ 48. Presumably what the plaintiffs intend

to say here is that Riedel knew *from or because of* his regular contacts with Imagyn that payment from Imagyn could not reasonably be assured.

recklessly in recognizing revenues from sales to Imagyn.

Because the claim that Hanley's "actual knowledge" that the collectibility of the Imagyn receivables was not reasonably assured derives, by inference in the amended complaint, from what Riedel knew, it follows that, if the allegations in the amended complaint as to Riedel's actual knowledge are insufficient to permit a strong inference of scienter as against Riedel, they are necessarily insufficient to permit such an inference with respect to Hanley.

■ The plaintiffs next argue that certain "publicly-available" information put the defendants on notice that collection of the Imagyn receivables was in substantial doubt. The plaintiffs allege a number of public reports of information regarding Imagyn's financial situation that were made during the early part of Galileo's first quarter of 1998. *See Amended Complaint* at 49–50. Specifically, the plaintiffs allege that the following information was publicly available at the time the defendants reported Galileo's first and second quarter financial condition:

- Imagyn's form 10–Q, filed with the SEC on November 10, 1997, stating that "Imagyn was not in compliance with certain financial covenants under its Senior Credit Facility";
- two publications, one by Moody's Investors Services that was issued on January 22, 1998, downgrading its rating of certain of Imagyn's notes due to liquidity problems; and the other by Standard and Poors on March 2, 1998, placing the company on "credit watch;"
- a press release issued by Conceptus, Inc. ("Conceptus") on April 27, 1998 in which Conceptus stated it had billed Imagyn for $250,000 for the quarter, "but could not recognize the revenue because Imagyn had failed to meet its contractual obligations;" and
- four press releases issued by Imagyn: a January 12, 1998 release reporting third quarter losses; an undated release

reporting on Imagyn's effort to reduce its operating costs by $18 million, including closure of an endoscope manufacturing facility, the termination of approximately 120 employees and other cost-cutting measures; a February 13, 1998 release confirming the third quarter losses; and a July 14, 1998 release stating that Imagyn was "facing a severe cash crisis, and that its auditors were investigating whether it could continue as a going concern."

As the plaintiffs themselves appear to acknowledge, their allegation that an inference of scienter on the part of the defendants arises from this "publicly-available information" concerning Imagyn's financial situation is, in effect, an allegation that an inference of scienter arises, not from the defendants' actual knowledge of Imagyn's financial condition, but from the defendants' constructive knowledge. *See, id.* at 49; *Plaintiffs' Memorandum in Opposition to the Motion to Dismiss* at 15–16. Thus, what the plaintiffs allege, in effect, is that a strong inference of the defendants' scienter arises because there existed at the relevant times publicly-available—and therefore discoverable—negative information that concerned an important source of income for Imagyn. That information, the plaintiffs suggest, put the defendants on notice that collection of the Imagyn receivables was in doubt.

This contention, however, is but a version of a "must have known" formulation. As noted earlier, however, the pleading of scienter may not rest on a bare inference that a defendant "must have had knowledge of the facts." *Lirette,* 27 F.Supp.2d at 282 (quoting *Maldonado* 137 F.3d at 9–10.) The defendants "still must allege with sufficient particularity that the defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to the public." *Id.* (quoting *Maldonado,* 137 F.3d at 9 n. 4).

It strikes me that, at most, the allegations concerning "publicly-available information" are allegations about negligent,

rather than reckless, conduct; that is, they are allegations about the defendants' negligence in failing to investigate and discover Imagyn's financial condition. Recklessness, the First Circuit has said, differs from negligence, not just in the degree of culpability involved, but in the kind of culpability as well. *Id.* at 199. Recklessness, therefore, involves more than a failure to investigate, even in the face of warning signs of trouble. *See Chill v. General Electric Co.*, 101 F.3d 263, 268 (2d Cir.1996) (parent company not reckless in failing to heed "red warning flags" and investigating subsidiary further before issuing financial reports); *In re College Bound Consol. Lit.*, 1995 WL 450486 *3 (S.D.N.Y. July 31, 1995) (failure by issuer of securities to inquire further into issuer's financial condition did not rise above negligence). Because at most the plaintiffs here have alleged only that the defendants failed to discover warning signs about Imagyn's financial condition, the plaintiffs have failed sufficiently to allege scienter in the form of reckless, as distinguished from negligent, conduct on the part of the defendants.[7] As such, the plaintiffs' publicly-available-facts allegations are fatally deficient in raising a strong inference of scienter.

█ The plaintiffs next allege that a strong inference of scienter arises from the violation of GAAP by the defendants in recognizing revenues from the Imagyn sales. The First Circuit has said that "[v]iolations of GAAP standards . . . [can] provide evidence of scienter." *Greebel,*

194 F.3d at 203. The GAAP violation alleged here is the recognition and reporting of revenues from the Imagyn sales in the first and second quarter 10–Q's for 1998 and the making of other public statements about Galileo's financial condition in the first and second quarters, when collection of the Imagyn revenues was not reasonably assured. Whether the collection of the Imagyn receivables was "reasonably assured," as Galileo argues, is fundamentally a subjective determination. *See Defendant Galileo Corporation's Memorandum in Support of their Motion to Dismiss the Consolidated Amended Class Action Complaint* at 17–18. Thus, application of the concept of "reasonable assurance of collection" in a given situation is a matter of judgment and estimate. In this case, "reasonable assurance of collection" was a fluid and subjective concept, dependent on the knowledge the defendants had at the time they made decisions about whether to record the Imagyn receivables in the pertinent 10–Q's and otherwise announce publicly first and second quarter results that included the Imagyn revenues. As noted earlier, the amended complaint does not sufficiently allege that the defendants had actual knowledge of information about Imagyn, the disregarding of which would create a strong inference of intentional or reckless conduct on the part of the defendants in the recognition of the Imagyn revenues. Subject thus to judgments, as to which reasonable persons might disagree, the proposition that col-

---

7. A factor militating against the proposition that the allegation that the publicly-available information raises a strong inference of the defendant's scienter is the fact that, with one possible exception, none of this information stated or suggested that Imagyn was unable to pay its suppliers generally, or that Imagyn was unable, in particular, to pay Galileo.

The one exception is the allegation that Imagyn's auditor's were investigating whether Imagyn could continue as a going concern in light of its severe cash crisis. *See Amended Complaint* at ¶ 50. Knowledge by the defendants of this information might well have given rise to a duty on their part to act. The

amended complaint alleges, however, that on July 23, 1998, Galileo reported results of its operations for the third quarter of fiscal year 1998. *See Amended Complaint* at ¶ 58. In that report, Galileo disclosed that the Imagyn receivable was not collectible, and that Galileo had recorded in the third quarter a provision to account for that uncollectibility. *Id.* The amended complaint thus shows that the defendants responded in just nine days after Imagyn's "going-concern" announcement. No strong inference of scienter arises, therefore, from allegations concerning the events of July 14 and July 23, 1998.

lectibility of the Imagyn revenues was not reasonably assured, standing alone as an allegation in this case, cannot support the strong inference of scienter required by the PSLRA and Rule 9(b).

Finally, with respect to the recognition by the defendants of revenues from the Imagyn sales in reports made about the first and second quarter 1998 results, the plaintiffs contend that a strong inference of scienter arises from the allegation that the recognition of those revenues violated Galileo's own revenue recognition and credit risk policies. *See Amended Complaint* at ¶ 89. "Courts have held that a violation of a company's own policies supports an inference of scienter." *Chalverus* 59 F.Supp.2d at 235 (citing *Provenz v. Miller,* 102 F.3d 1478, 1490 (9th Cir.1996)). The plaintiffs point out that in its form 10–K405, filed with the SEC for fiscal year 1997, Galileo stated: "The company records a sale and recognizes revenue when title passes to the customer or when services are performed in accordance with contracts. *The company extends credit to customers based on evaluating financial condition ...*" *Amended Complaint* at ¶ 89 (emphasis in amended complaint). The plaintiffs argue that, given these representations, "it is reasonable to infer" that, in permitting revenue from the Imagyn sales to be included in financial statements about Galileo's first and second quarters, 1998, the defendants acted with the knowledge, or in reckless disregard, of Imagyn's publicly-known precarious financial condition. *See Plaintiffs' Memorandum in Opposition to Defendants' Motions to Dismiss* at 17.

The short answer to this argument, of course, is that a mere reasonable inference of scienter does not satisfy the pleading requirements of the PSLRA and Rule 9(b). The inference, as noted earlier, must be reasonable and strong. *See Greebel,* 194 F.3d at 196–97.

Moreover, the amended complaint does not allege facts, which, if believed, would be sufficient to show that the recognition of revenues from the Imagyn sales in the first and second 10–Q's was inconsistent with Galileo's revenue recognition and credit risk policies. First, there is no allegation that Galileo recognized revenue from the Imagyn sales at any time other than when title to the endoscopes passed to Imagyn. As for the representation in the 1997 form 10–K405 that Galileo extends credit to customers based on an evaluation of the customer's financial condition, there is no allegation that Galileo failed properly to evaluate Imagyn's financial condition. Nor is there an allegation as to when Galileo performed its credit evaluation of Imagyn. As to the latter point, the amended complaint does not exclude the possibility that the evaluation was performed before November, 1997 (the date by which, according to the plaintiffs, the defendants knew that Imagyn was having serious financial difficulties), and that the evaluation showed Imagyn to be in satisfactory financial condition.[8] In any event, it does not necessarily follow that, even if the defendants had known, at the time they made various statements about Galileo's financial condition, that Imagyn was experiencing financial difficulties, the defendants also would have known that Galileo's receivables attributable to Imagyn were in sufficient doubt to preclude the recognition of revenues from the Imagyn sales. Finally, putting the very best face on the allegations concerning the defendants' violation of Galileo's policies, the allegations amount to wrongful conduct no greater than negligence in failing properly to assess Imagyn in light of Galileo's policies.

For the foregoing reasons, I conclude that the allegations concerning the recognition and reporting of revenue from the sales to Imagyn in the first and second quarters of 1998 are insufficient to estab-

---

8. The plaintiffs do not allege, after all, that the sales at issue should not have been made to Imagyn or that credit should not have been extended to that company in the first place.

lish a strong inference of scienter on the part of the defendants.

### b. *Physician Sales*

■ The plaintiffs allege that the March 19, 1998 press release issued by the defendants concerning the five-year supply and distribution agreement that Galileo had concluded with Physician Sales for the distribution, by Physician Sales, of certain women's health, diagnostic and surgical products (the "Leisegang products") was false or misleading. The plaintiffs claim that the press release represented that the agreement with Physician Sales would constitute a major source of revenue for Galileo for five years, and that the agreement would have an immediate impact on the company's revenues in the first year. The plaintiffs assert that the press release was false or misleading because it failed to contain cautionary language to the effect that Galileo might not achieve "these substantial revenue goals." *Amended Complaint* at ¶ 34. The plaintiffs allege, in addition, that the press release was false or misleading because it did not disclose that (1) Galileo could not enforce the minimum purchase requirements imposed on Physician Sales by the agreement and (2) the agreement contained no monetary penalty if Physician Sales failed to meet the minimum purchase requirements.

The plaintiffs' claim appears to be based on the theory that the press release stated or implied that Physician Sales was *required* to make $150 million in purchases of Leisegang products over the five-year term of the agreement, including $25 million in purchases during the first year of the agreement. But the press release made no such statement. It merely stated that, in order for Physician Sales to retain exclusive distribution rights with respect to the Leisegang products, Physician Sales had to satisfy certain minimum purchase requirements. The press release did not state or imply that Physician Sales *would* meet those minimum requirements; that is to say, the press release did not state or

imply that revenues of $150 million dollars *were guaranteed* over five years or that $25 million dollars in revenues *would be achieved* by Galileo in the first year of the agreement. The press release was a plain statement of what the Physician Sales agreement actually provided: the distribution of Leisegang products over five years, with minimum purchase requirements as a condition of Physician Sales' retention of the exclusive right to distribute those products. Indeed, the plaintiffs' use of the phrase "substantial revenue goals" to describe the import of the press release in the amended complaint, *see id.* at ¶¶ 34–35, itself suggests the defect in the plaintiffs' Physician Sales claim: at best, all that the press release did was to describe—perhaps with some enthusiasm and optimism—revenue *goals* that Galileo *hoped* to achieve from its agreement with Physician Sales. No reasonable investor would have seen in the press release a *promise* of sales at specific levels, under all circumstances, during the first year or over the term of the agreement. In a fraud-on-the-market of the kind alleged here, a claim of fraud "can draw no sustenance from allegations that the defendants made overly-optimistic statements if those statements are ones that any reasonable investor would . . . recognize as nothing more than a kind of self-directed puffery." *Shaw,* 82 F.3d at 1218; *see also Fitzer v. Security Dynamics Technologies,* 119 F.Supp.2d 12, 23 (D.Mass.2000); *Suna,* 107 F.3d at 71. The amended complaint thus fails to allege with particularity facts tending to show that the press release was false or misleading.

■ Moreover, even if the March, 1998 press release could be said to have been false or misleading, the plaintiffs have alleged no facts from which a strong inference of scienter on the part of the defendants can be drawn. In paragraph 35 of the amended complaint, the plaintiffs allege facts pertaining to the history of sales of Leisegang products prior to 1998. These allegations are meant to show that

the defendants could not reasonably have concluded that Physician Sales could sell sufficient quantities of Leisegang products to meet the minimum revenue requirements of the agreement. The allegations fall short of establishing scienter, however, because they are devoid of any claim that the defendants knew the details of Physician Sales' history of sales of Leisegang products. For reasons similar to those given earlier, with respect to the issues raised by recognition of the Imagyn revenues, I conclude that the allegation that Physician Sales had an easily discoverable sales history is not sufficient to create a strong inference of scienter regarding any alleged false or misleading statement in the March 19, 1998 press release. *See supra* part III(B)(1)(a). Like the allegation about publicly-available information as to the collectibility of the Imagyn revenues, the allegations here about a discoverable sales history for Physician Sales are simply "must have known" allegations, and hence, allegations of no greater culpability than negligence on the part of the defendants.

### c. *Sofamor Danek*

■ The plaintiffs contend that Galileo's second quarter 10–Q and related financial statements were materially false or misleading and contrary to GAAP because the defendants failed to establish a warranty reserve, or otherwise account, for the return to Galileo of $800,000 in specialty endoscopes claimed by one of Galileo's customers, Sofamor Danek, to be defective. The plaintiffs allege that Galileo's second quarter 10–Q stated that it was prepared in accordance with GAAP, and that GAAP required that Galileo establish a warranty reserve or charge with respect to revenue from sales that Galileo previously had recognized, to account for the estimated cost of repairing or replacing the endoscopes. The plaintiffs allege that the defendants never established the required reserve, did not disclose the return of the endoscopes by Sofamor Danek, and that following the class period, the defendants charged off a portion of the revenue attributable to the sales to Sofamor Danek.

The plaintiffs again fail to meet the pleading requirements of the PSLRA and Rule 9(b). " '[A] general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation [to satisfy Rule 9(b)].' " *Gross v. Summa Four, Inc.*, 93 F.3d 987, 996 (1st Cir.1996) (quoting *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 362 n. 5 (1st Cir.1994)). Such is the nature and effect of the allegations at issue here. The plaintiffs allege only in general terms that Galileo's revenues were falsely reported in the second quarter, to the extent that those results omitted a warranty reserve for the returned endoscopes. The plaintiffs claim that Sofamor Danek returned the defective endoscopes sometime in February or March 1998. The plaintiffs do not allege, however, details like the nature of the defect, the known or anticipated cost of repairing or replacing the endoscopes, or when the endoscopes would be repaired or replaced. Furthermore, the plaintiffs do not assert the amount of the reserve that the defendants should have established. *See id.* (quoting *Roots Partnership v. Land's End, Inc.*, 965 F.2d 1411, 1419 (7th Cir.1992) ("[A]llegation that company 'failed to establish adequate reserves for its excessive and outdated inventory' does not satisfy Rule 9(b) where investor does not allege 'what the reserves were or suggest how great the reserves should have been.' "))

Moreover, as Galileo points out in its brief on the present motions, the deficiencies in particularity in the plaintiffs' fraud allegations are not cured by the plaintiffs' unspecific and conclusory allegation that "[a] portion of the revenue booked on sales to Sofamor Danek was ultimately charged off after the [class period]." *Defendant Galileo Corporation's Memorandum of Law in Support of their Motion to Dismiss the Consolidated Amended Class Ac-*

*tion Complaint* at 24 (quoting ¶ 46 of the amended complaint). For one thing, the allegation fails to specify the portion of the charged-off revenues attributable to the Sofamor Danek sales. For another, the allegation fails to relate the charge-off to any repair or replacement costs incurred by Galileo. Indeed, the amended complaint does not even allege that Galileo incurred any significant repair or replacement costs, or that such costs were not otherwise accounted for in the reports of Galileo's second quarter results.

### d. *Export Restrictions*

██ The plaintiffs allege that Galileo's second quarter 10–Q and the other statements about the company's financial condition in the second quarter 1998 also were false or misleading because the defendants did not disclose government restrictions on the foreign export of certain microchannel plate products used in Galileo's scientific detector and spectroscopy products sold abroad. The plaintiffs allege that foreign sales of scientific detector and spectroscopy products were a material part of Galileo's business, but that the defendants failed to disclose the actual or potential loss of sales due to the export restrictions until the release of Galileo's third quarter results on July 23, 1998.

With respect to this claim, the plaintiffs again have failed to plead securities fraud with sufficient particularity to survive the motions to dismiss. First, the plaintiffs fail to allege the extent of the export restrictions and when they became effective. Second, the plaintiffs do not allege with particularity the impact that the export restrictions had on second quarter results.

██ As to scienter, the amended complaint makes only the vague and conclusory allegation that Hanley and Riedel knew or recklessly disregarded that "export restrictions had been and would likely continue to be imposed during the second quarter and in the future, and that the restrictions would have a material adverse effect on [Galileo's] product sales in the second and future quarters." *Id.* at ¶ 55. The only support the plaintiffs offer for these assertions is that the defendants "sent Robert White, general manager for Galileo's Scientific Detector Division, to Washington frequently during the second quarter to meet with federal government officials on the issue of export restrictions." *Id.* Absent, however, are any specific allegations concerning the identity of the government officials with whom White met, when he met with those officials and what was said during those meetings on the issue of export restrictions. For all that appears, the meetings White had with government officials might well have left the defendants with the conviction that no restrictions would be imposed on Galileo's products, or that, if imposed, the restrictions would have had but limited effect on Galileo's foreign sales of scientific detector and spectroscopy products. As they stand, then, the allegations in the amended complaint fall far short of creating a strong inference of scienter as to the claimed withholding of information regarding the export restrictions.

### e. *The October 1998 Restatement of Miscellaneous Revenue*

██ On October 29, 1998, Galileo announced that it had determined that $393,000 in miscellaneous revenues, previously recognized in the second quarter, should have been recorded as revenues in the third quarter. The plaintiffs allege that Galileo's second quarter financial reports were therefore false or misleading because they recognized these miscellaneous revenues. The miscellaneous revenues in question, the plaintiffs say, were based on sales that had not been completed in the second quarter.

The plaintiffs' only allegation in support of the claim that the miscellaneous revenues were improperly recognized in the second quarter is the assertion that the revenues "were not recordable as sales under GAAP because all of the requirements for completion of the sales had not

occurred." *Amended Complaint,* at ¶ 53; *see id.* at 67. As noted earlier, violations of GAAP standards may provide evidence of scienter. *Greebel,* 194 F.3d at 203. "To support even a reasonable inference of scienter, however, the plaintiffs must describe the [GAAP] violations with sufficient particularity." *Id.* Here the amended complaint is totally lacking in specificity: it does not identify the transactions giving rise to the miscellaneous revenues; and it does not state in what particulars those transactions were not completed during the second quarter, or otherwise how the alleged GAAP violations occurred in the recognition of revenues from those transactions. Under these circumstances, the plaintiffs have failed to satisfy the requirements of the PSLRA and Rule 9(b), both as to the particulars in which the statements were false or misleading and as to the particulars of the scienter requirement. The amended complaint merely asserts that the defendants' third quarter adjustment acknowledging that the adjustment should have been made in the second quarter, demonstrates that the defendants' statements about the second quarter were fraudulent. This kind of argument that "it must be fraud," because error is acknowledged, will not wash under the PSLRA and Rule 9(b). As the court said in *Peritus Software:* ("[P]laintiffs cannot 'use disclosures after the date of the statement to show that the company knew that problems existed at the earlier date and should have disclosed them.' ") 52 F.Supp.2d at 223. (quoting *In Re Viewlogic Sys. Sec., Litig.* No. 95–10014–DPW, slip. op. 14–15 (D.Mass. March 13, 1996)).

f. *General Allegations Concerning Scienter*

■ In addition to specific allegations concerning scienter, with respect to the several acts or omissions of the defendants alleged by the plaintiffs to have constituted securities fraud, the plaintiffs also make a general allegation concerning the state of mind of the defendants. The plaintiffs assert that Hanley and Riedel were moti-

vated to violate the securities laws by a desire "to use Galileo's common stock as currency for much needed acquisitions of revenue producing businesses." *Amended Complaint* at ¶ 94. That allegation, together with the allegation in paragraph 93 of the amended complaint that Hanley and Riedel held management positions and actively participated in the preparation of Galileo's financial statements, and the allegation in paragraph 104 of the amended complaint that Hanley and Riedel were controlling persons of Galileo, amounts to a claim that Hanley and Riedel had both motive and opportunity to engage in wrongful conduct.

While there may be cases in which allegations of motive and opportunity are enough to permit the drawing of a strong inference of scienter, "merely pleading motive and opportunity, regardless of the strength of the inferences to be drawn of scienter, is not enough." *Greebel,* 194 F.3d at 197. I need not decide in this case whether the plaintiffs have sufficiently alleged the opportunity prong, because the allegations of motive are plainly insufficient. The amended complaint here alleges no underlying facts to support the allegation that Hanley and Riedel were motivated by a desire to use Galileo's common stock as currency for acquisitions of new businesses. The plaintiffs do allege that the "inflated" stock of Galileo allowed Hanley and Riedel to acquire one new business. *See Amended Complaint* at ¶ 94. The amended complaint does not allege, however, when that acquisition occurred. More to the point, however, the mere statement that an acquisition occurred after Galileo's stock prices increased is insufficient even to create an inference that the two events were necessarily related, not to mention insufficient to create a strong inference either of an intent to deceive or of recklessness. Given the deficiencies in the other allegations of scienter, discussed above, the allegation presently at issue is but a bare pleading of motive and opportunity without allegations

**271**

of other facts raising a strong inference of scienter. As such, the allegation is not enough to satisfy the requirements of the PSLRA or Rule 9(b). *See Greebel,* 194 F.3d at 197.

### g. *Summary of Part III(B)*

Based on all of the foregoing, I rule that the plaintiffs' allegations regarding securities fraud, based on representations or omissions of the defendants concerning (a) Imagyn Sales, (b) Physician Sales, (c) Sofamor Danek, (d) the export restrictions and (e) miscellaneous revenue, or based on the existence of the defendants' motive and opportunity, fail to satisfy the pleading standards of the PSLRA and Rule 9(b). Accordingly, count I of the amended complaint is DISMISSED.

### 2. *Count II—Violation of Section 20(a)*

Count II of the complaint alleges that Hanley and Riedel violated section 20(a) of the Exchange Act. Section 20(a) provides a cause of action against any person who exerts direct or indirect control over a corporation that acts in violation of the securities laws. *See* 15 U.S.C. § 78t(a).[9] The plaintiffs allege that Hanley and Riedel, as officers and directors of Galileo, exercised their management power and control over Galileo to cause the Company to engage in the violations of the securities laws alleged in the complaint.

Because I have determined that the plaintiffs have failed adequately to plead securities fraud under the PSLRA and Rule 9(b), the plaintiffs cannot show a primary violation under the Exchange Act. "In the absence of a primary violation, secondary 'controlling person' liability cannot exist.'" *Peritus Software,* 52 F.Supp.2d at 230; *see also In re Boston Tech.,* 8 F.Supp.2d at 72. Accordingly,

count II of the amended complaint also is DISMISSED.

### IV. *Conclusion*

For the foregoing reasons, the defendants' motion to dismiss the plaintiffs' amended complaint is GRANTED. The clerk shall enter a judgment dismissing the amended complaint.

So ordered.

---

**9.** 15 U.S.C. § 78t(a) provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such

controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.