**In re FOCUS ENHANCEMENTS, INC. SECURITIES LITIGATION.**

Nos. CIV.A. 99–12344–DPW, CIV.A. 99–12634–DPW, CIV.A. 00–10009–DPW, CIV.A. 00–10400–DPW, CIV.A. 00–10411–DPW, CIV.A. 00–10420–DPW, CIV.A. 00–10423–DPW, CIV.A. 00–10425–DPW, CIV.A. 00–10430–DPW, CIV.A. 00–10437–DPW, CIV.A. 00–10458–DPW, CIV.A. 00–10517–DPW, CIV.A. 00–10523–DPW, CIV.A. 00–10547–DPW, CIV.A. 00–10556–DPW, CIV.A. 00–10596–DPW, CIV.A. 00–10710–DPW.

United States District Court, D. Massachusetts.

May 10, 2001.

David Pastor, Kenneth G. Gilman, Gilman and Pastor, LLP, Saugus, MA, Kevin F. Ruf, Lionel Z. Glancy, Michael Goldberg, Michael D. Howald, Peter A. Binkow, Tracy L. Thrower, Law Offices of Lionel Z. Glancy, Los Angeles, CA, Robert C. Susser, Robert C. Susser, P.C., Robin Bronzaft Howard, Law Offices of Lionel Z. Glancy, New York City, Brian Barry, Law Offices of Brian Barry, Jeffrey C. Block, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, Alicia M. Duff, Bernstein, Litowitz, Berger & Grossmann LLP., San Diego, CA, David L. Kelston, Adkins, Kelston, Zavez, PC, Boston, MA, Gina M. Cothern, Cauley & Geller, LLP, Scott E. Poynter, Cauley, Geller, Bowman & Coates, LLP, Steven E. Cauley, Cauley, Geller, Bowman & Coates, Little Rock, AR, Edward F. Haber, Thomas G. Shapiro, Shapiro, Haber & Urmy LLP, Nancy F. Gans, Stephen Moulton, Moulton & Gans, PC, Boston, MA, for Plaintiffs.

Justin S. Kudler, Schatz & Nobel, P.C., Hartford, CT, Peter M. Saparoff, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Theodore E. Dinsmoor, Burns & Levinson LLP, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Before me are two separate consolidated class action complaints alleging violations of the Securities Exchange Act of 1934 by Focus Enhancements, Inc. and several members of senior management. Both plaintiff groups allege violations by the defendants of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), (Count I), and of Section 20(a) of the Exchange Act (Count II).

The *Ridel* action was brought on behalf of investors who purchased Focus stock between July 17, 1997 and February 19, 1999, and alleges a scheme by defendants to inflate the Focus stock price artificially through a pattern of misrepresentations and omissions to state material facts with respect to revenue recognition, new product announcements and market acceptance.

The *James* action was brought on behalf of investors who purchased Focus stock between November 15, 1999 and March 1, 2000, and alleges that Focus misrepresented its ability to monitor inventory levels and maintain adequate reserves in 1999.

*Ridel* and *James* both allege that when the truthful information about the financial condition of Focus was revealed—on February 19, 1999 and March 1, 2000, respectively—the company's stock price dropped substantially, causing injury to the plaintiffs.

The defendants have moved to dismiss amended complaints in both actions on the grounds that the plaintiffs do not satisfy the strict pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4, and of Fed.R.Civ.P. 9(b).

## I. BACKGROUND

### A. Defendants

Focus is a Delaware corporation with its principal place of business in Wilmington, Massachusetts. (James 2d Am. Compl. ¶ 19.) Focus manufactures and sells a proprietary line of video conversion products for the computer and television industries. (*Id.*) These products are sold globally through a network of resellers and

original equipment manufacturers ("OEMs"). (*Id.*)

Thomas Massie, a defendant in both the *Ridel* and the *James* actions, is a co-founder of Focus, and was, at all relevant times, President, Chief Executive Officer, and Chairman of the Board. (Ridel 2d Am. Compl. ¶ 16.) On May 2, 2000, he resigned as President and CEO, but remains Chairman of the Board. (*Id.*) As of April 22, 1999, Massie was the Company's largest shareholder, with beneficial ownership of 5.66% of Focus' outstanding shares. (*Id.*) During the James plaintiffs' class period, Massie sold 134,352 shares of his common stock and 60,607 shares on behalf of his family, for approximately $1.5 million. (James 2d Am. Compl. ¶ 20.)

Brett Moyer, a defendant in the *James* matter, joined Focus on May 5, 1997 as President and Chief Operating Officer. In 1998, he became Vice President of Pro AV Sales. (James 2d Am. Compl. ¶ 22.) During the James plaintiffs' class period, Moyer sold his Focus shares for approximately $37,750. (*Id.*)

Gary Cebula, a defendant in the *James* matter, served as Vice President of Finance and Administration and Treasurer from April 1998 until his resignation on May 2, 2000. (James 2d Am. Compl. ¶ 21.)

Harry Mitchell, a defendant in both the *Ridel* and the *James* actions, was the Senior Vice President, Treasurer, and Chief Financial Officer from February 1997 until he resigned during the *Ridel* Class Period. (Ridel 2d Am. Compl ¶ 18.)

## B. Factual Background

Since its initial public offering in 1993, Focus has restated its financial results for 1996 and for two quarters in 1997. Focus also took charges to earnings in the fourth quarters of 1995, 1997, and 1998. (James 2d Am. Compl. ¶ 37.)

In a 1996 Form 8–K, Focus disclosed that its independent auditor, Coopers & Lybrand, had resigned. (James 2d Am. Compl. ¶ 41.) Cooper's letter to the SEC, attached to the Focus 1996 8–K/A, identified several areas of concern, including: (1) the level of reserves recorded for potential bad debts and product returns; (2) the level of reserves recorded for potential excess or obsolete inventory; and (3) the valuation of certain Focus warrants. (James 2d Am. Compl. ¶ 44.) To avoid receiving a negative opinion from Coopers in connection with its 1995 audit, Focus took a charge of approximately $847,000 for 1995.[1] (James 2d Am. Compl. ¶ 45.)

In 1997, Nasdaq investigated Focus and required it to restate its financial results for 1996 and the first two quarters of 1997 to reflect a $1.2 million write-down in assets and $400,000 in additional reserves. (James 2d Am. Compl. ¶¶ 50–51.) Nasdaq also required Focus to amend its revenue recognition accounting policy to provide for estimated returns resulting from "stock balancing" transactions (the right to exchange non-defective products for different merchandise). (*Id.* ¶ 51.)

On October 8, 1997, Focus announced an amendment to its registration statement, enabling warrantholders to exchange their Focus warrants for shares of its common stock. (Ridel 2d Am. Compl. ¶ 148.) On March 3, 1998, Focus entered into a private placement with an unaffiliated investor for gross proceeds of approximately $3 million. (Ridel 2d Am. Compl. ¶ 149.) On May 6, 1998, Focus adjusted its warrants

---

1. James contends that Coopers' resignation and the large 1995 charge "should have served as a lesson for defendants, making them aware of the necessity of proper internal financial controls and the importance of properly reserving for returns and write downs of inventory." (James 2d Am. Compl. ¶ 46.)

to be exercisable at $6.75 per warrant (or $3.73 per share). Focus announced on June 8, 1998 that 910,650 of its warrants had been exercised, resulting in $6,146,887.50 in proceeds to Focus. (Ridel 2d Am. Compl. ¶ 151.)

On March 12, 1998, Focus filed its 1997 Form 10–K, reporting a net loss of approximately $2.6 million, despite having reported increasing sales and positive net income for the first three quarters. (Ridel 2d Am. Compl. ¶ 99.) Focus attributed the loss primarily to higher product returns, because the Company allowed "certain distributors and retailers to return first generation PC to TV video conversion products" in anticipation of shipment of the new FS300 product line, and to increased marketing expenses associated with the planned product launch. (*Id.*) Of the $4.1 million in 1997 returns, $2.5 million was recorded during the fourth quarter. (*Id.*) The 1997 10–K also stated that defective product returns represented only 0.5% of company revenues. (*Id.*)

On April 6, 1998, Focus announced its acquisition of Digital Vision, Inc. The acquisition was financed by 350,000 shares of Focus common stock. (Ridel 2d Am. Compl. ¶ 150.) Focus also announced, on July 31, 1998, an agreement to purchase PC Video Conversion Corp. for $2.05 million, financed in part by approximately 125,000 shares of Focus common stock. (Ridel 2d Am. Compl. ¶ 152.)

On September 1, 1998, Focus repriced all outstanding employee and director options to $1.22 for all options priced above that figure. (Ridel 2d Am. Compl. ¶ 153.)

Focus again repriced its options, on February 19, 1999, to $1.0625. Ridel alleges that defendants repriced Focus options to "continue to reap the gains of their fraud on the class." (Ridel 2d Am. Compl. ¶ 155.)

On February 19, 1999, the last day of the Ridel Class Period, Focus announced that it expected to report a net loss of approximately $12.7 million for 1998. Focus attributed the loss primarily to its decision to consolidate its reseller channel, which resulted in the return of inventory from non-performing resellers. (Ridel 2d Am. Compl. ¶ 120; James 2d Am. Compl ¶¶ 63–64.) In response, on February 22, 1999, the next day of trading, Focus' stock price dropped to as low as $0.93 per share on heavy volume of 450,000 shares. (Ridel 2d Am. Compl. ¶ 121.) On April 15, 1999, Focus released its 1998 financial results, reporting a net loss of $12,787,324, including approximately $3.4 million for sales returns. (Ridel 2d Am. Compl. ¶¶ 122–123.)

On October 5, 1999, Focus announced the signing of a letter of intent to merge with Faroudja, Inc., subject to completion of due diligence and shareholder approval. (James 2d Am. Compl. ¶ 84.) Merger discussions with Faroudja were terminated, without explanation, on November 11, 1999.[2] (*Id.* ¶ 86.)

Focus filed its Amended Third Quarter 10–Q 1999 on November 16, 1999, assuring investors that the Company "continually monitors inventory levels at its resellers and maintains reserves for potential product returns."[3] Focus' stock price rose

---

2. James asserts that "a strong inference arises that in the course of performing due diligence, Faroudja discovered Focus' knowing and/or reckless failure to monitor its inventory levels and properly reserve for returns and thus Focus' financial health was far worse than Faroudja had expected when it signed the letter of intent on October 5, 1999." (James 2d Am. Compl. ¶ 87.)

3. Focus also reported on its Amended 3Q 10–Q 1999 that it had entered into an accounts receivable financing agreement with the Silicon Valley Bank on March 22, 1999, and

over 134% from approximately $1 to $2–11/32 on November 19, 1999. (James 2d Am. Compl. ¶¶ 89–90, 92.) By early December 1999, the stock price had reached approximately $4, and on January 6, 2000, Focus stock reached a Class Period high of $9–7/32. (*Id.* ¶ 92.)

Thomas Massie sold approximately 195,-000 shares on behalf of himself and his family on December 3, 1999. Brett Moyer sold all 12,000 of his Focus shares between November 19 and November 29, 1999. (James 2d Am. Compl. ¶ 142.) Prior to the Class Period, Massie had last sold shares on September 17, 1998, and Moyer had not sold any of his Focus shares. (*Id.* ¶ 144.) Other insiders also sold shares between December 6 and December 10, 1999. (*Id.* ¶ 143.)

On March 1, 2000, Focus announced that it would report a loss of $0.06 per share for 1999 and that it had formed a special committee to investigate financial issues. As a result, Focus' shares fell 39% to close at $4–3/8 on March 2, 2000. (Ridel 2d Am. Compl. ¶ 137; James 2d Am Compl. ¶¶ 94–100.)

Focus filed its 1999 Form 10–K on April 14, 2000, disclosing that the special committee had found that a Focus accounting manager had misstated inventory records for the Pro AV series and had been discharged. (Ridel 2d Am. Compl. ¶ 139; James 2d Am. Compl. ¶ 114.) On May 2, 2000, Focus announced that Cebula and Massie had resigned as officers, although

Massie retained his title as Chairman of the Board. (Ridel 2d Am. Compl. ¶ 140.)

On August 15, 2000 (four days after the filing of the James Amended Complaint), Focus revealed in an SEC filing that it needed to restate revenues for the second and third quarters of 1999. In a press release issued the same day, Focus disclosed that it expected the restatements to reduce revenue by $363,000 and $908,000, respectively. (James 2d Am. Compl. ¶¶ 9, 127.)

## C. Procedural History

On November 9, 1999, Frank Ridel commenced a class action against Focus and Massie on behalf of investors who purchased Focus stock between July 17, 1997 and February 19, 1999. By Order issued on January 13, 2000, I consolidated the Ridel action with other class actions for that period filed against Focus.[4] On January 12, 2000, the plaintiffs moved for appointment of lead plaintiff and lead counsel. On February 23, 2000, I granted a motion appointing Ridel lead plaintiff.

On March 3, 2000, Pond Equities filed a class action on behalf of investors who purchased Focus stock between April 29, 1999 and March 1, 2000. Other class actions for that period were filed thereafter as consolidated cases.[5] Class member Guy James moved for appointment as lead plaintiff and lead counsel for this group on May 24, 2000. At a hearing on June 9,

used a $2 million advance under this agreement to repay all monies owed under a credit agreement with another lender. The agreement with Silicon Valley Bank provided for default if Focus became insolvent in that "its debts are greater than the fair value of its assets." (James 2d Am. Compl. ¶ 149.)

4. The following docket numbers apply to cases consolidated in the *Ridel* group: 99–12344–DPW, 99–12634–DPW, 00–10009–DPW.

5. The following docket numbers apply to cases consolidated in the *James* group: 00–10400–DPW, 00–10411–DPW, 00–10420–DPW, 00–10423–DPW, 00–10425–DPW, 00–10430–DPW, 00–10437–DPW, 00–10458–DPW, 00–10517–DPW, 00–10523–DPW, 00–10547–DPW, 00–10556–DPW, 00–10596–DPW, 00–10710–DPW.

2000, I granted the motion appointing James lead plaintiff.

At the February 7, 2001 hearing on this matter, I afforded the plaintiffs a second opportunity to amend their consolidated complaints in order to particularize their pleadings further and, particularly in the case of Ridel, to determine whether they intended to identify the previously unnamed informants who provided the basis for certain of their allegations. Ridel and James subsequently filed Consolidated Second Amended Class Actions Complaints with this court, in response to which defendants filed supplemental motions to dismiss.

## II. PLEADING STANDARDS

### A. Pleading Standards—Legal Framework

In considering a motion to dismiss, I must "accept as true all well-pleaded allegations and give the plaintiffs the benefit of all reasonable inferences." *Cooperman v. Individual, Inc.*, 171 F.3d 43, 46 (1st Cir.1999). I may grant the motion to dismiss only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Fitzer v. Security Dynamics Technologies, Inc.*, 119 F.Supp.2d 12, 17 (D.Mass.2000) (quoting *Roeder v. Alpha Indus.*, 814 F.2d 22, 25 (1st Cir.1987)). However, I may disregard unsupported or conclusory assertions made in the complaint. *See Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1216 (1st Cir.1996).

### 1. *Section 10(b) and Rule 10b–5 Claims*

Section 10(b) of the Exchange Act prohibits the use of, in connection with the purchase or sale of any security, "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe...." 15 U.S.C. § 78j(b). Rule 10b–5, promulgated under § 10(b), provides that:

> It shall be unlawful for any person ... (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a claim under § 10(b) and Rule 10b–5, a plaintiff must show, in connection with the purchase or sale of a security, (1) a misrepresentation or omission of material fact, (2) made with scienter, (3) upon which the plaintiffs relied, and (4) that caused damages to the plaintiffs.[6] *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir.1996); *Van de Velde v. Coopers & Lybrand*, 899 F.Supp. 731, 734 (D.Mass.1995) (citing *Basic v.*

---

**6.** James explicitly pleads reliance by alleging fraud on the market, (James 2d Am. Compl. ¶¶ 31–32), and a similar argument may be inferred from the Ridel Amended Complaint. A viable § 10(b) fraud-on-the-market claim can be pled without alleging specific reliance. *In re PLC Systems, Inc. Sec. Litig.*, 41 F.Supp.2d 106, 116 (D.Mass.1999). The claim alleges that defendants' misrepresentations caused injury "by dint of the statements'

inflating effect on the market price of the security purchased. When the truth is disclosed and the market self-corrects, investors who bought at the inflated price suffer losses. Those losses can be deemed to have been caused by the defendants' statements, even absent direct reliance by plaintiffs, because the statements were presumptively absorbed into and reflected by the security's price." *Id.* at 116–17 (quoting *Shaw*, 82 F.3d at 1218).

*Levinson,* 485 U.S. 224, 230–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). In the context of private securities litigation, the First Circuit has held that, "information is 'material' only if its disclosure would alter the 'total mix' of facts available to the investor and 'if there is a substantial likelihood that a reasonable shareholder would consider it important' to the investment decision." *Cooperman v. Individual, Inc.,* 171 F.3d 43, 49 (1st Cir.1999) (citations omitted). Scienter, as defined by the Supreme Court, is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Failure to plead these elements results in dismissal of the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim.

#### 2. *Rule 9(b) and PSLRA*

A plaintiff alleging securities fraud also must meet the heightened pleading requirements of Fed.R.Civ.P. 9(b) and the PSLRA[7] in order to survive a Rule 12(b)(6) motion to dismiss.

Rule 9(b) requires that, "the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b).

The PSLRA imposes a similar particularity requirement, requiring that a complaint alleging securities fraud set forth, "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts

on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Furthermore, to allege scienter, the complaint must, for each alleged misleading act or omission, "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." [8] 15 U.S.C. § 78u–4(b)(2); *see also In re Galileo Corp. Shareholders Litig.,* 127 F.Supp.2d 251, 260 (D.Mass.2001).

◼ The First Circuit has been "notably strict and rigorous" in construing the Rule 9(b) standard in the securities context. *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 193 (1st Cir.1999); *see Maldonado v. Dominguez,* 137 F.3d 1, 9 (1st Cir.1998). In *Greebel,* the First Circuit concluded that the "PSLRA's pleading standard is congruent and consistent with the pre-existing standards of this circuit." *Greebel,* 194 F.3d at 193. Thus, to allege securities fraud in this circuit, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Suna v. Bailey Corp.,* 107 F.3d 64, 68 (1st Cir.1997). Moreover, "plaintiffs who bring their claims on information and belief [must] 'set forth the source of the information and the reason for the belief.'" *In re Galileo Corp.,* 127 F.Supp.2d at 261 (quoting *Greebel,* 194 F.3d at 194). This heightened pleading is required "even when the fraud relates to matters peculiarly within the knowledge of the opposing party." *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991).

---

**7.** Congress enacted the PSLRA in 1995 in an effort to "curtail the filing of abusive lawsuits at the pleading stage of litigation by establishing uniform and stringent pleading requirements." *In re Galileo Shareholders Litig.,* 127 F.Supp.2d 251, 260 (D.Mass.2001).

**8.** The PSLRA also provides a "safe harbor" for forward-looking statements. 15 U.S.C. § 78u–5(c). Where plaintiffs allege false forward-looking statements, they must show that the statements were made with "actual knowledge" of their falsity. *See id.*

*3. Scienter*

■ Even if the Amended Complaint satisfies the heightened pleading requirements discussed above, it must be dismissed if it fails adequately to allege scienter. To show scienter, both Rule 9(b) and the PSLRA require that plaintiffs allege "facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *see also Maldonado*, 137 F.3d at 9 n. 5 (PSLRA standard for pleading scienter does not differ from that which First Circuit has historically applied). A "mere reasonable inference [of scienter] is insufficient to survive a motion to dismiss." *In re Galileo*, 127 F.Supp.2d at 261 (quoting *Greebel*, 194 F.3d at 196–97).

■ Plaintiffs may establish scienter by showing the defendants' "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). *See also Greebel*, 194 F.3d at 194. The First Circuit has held that the scienter requirement may also be met by a showing of conduct that amounts to recklessness.[9] *See In re Galileo*, 127 F.Supp.2d at 261. Recklessness involves more than mere negligence or a "failure to investigate, even in the face of warning signs of danger." *Id.* at 265. The First Circuit has defined recklessness as "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." *Greebel*, 194 F.3d at 198.

Where the plaintiff opts to prove scienter by recklessness, he must still allege, with sufficient particularity, that "the defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *In re Galileo*, 127 F.Supp.2d at 261 (quoting *Maldonado*, 137 F.3d at 9 n. 4). Consequently, a plaintiff does not satisfy the requirements of Rule 9(b) and the PSLRA by pleading "fraud by hindsight." *Gross*, 93 F.3d at 991; *see Serabian*, 24 F.3d at 367 (allegation that defendants "must have known of the severity of their problems earlier because conditions became so bad later on" is insufficient). Nor is scienter pleaded sufficiently by allegations that defendants "must have known the facts solely by virtue of their positions with the issuer of the securities . . . [or] because they were privy to internal corporate information not specified in the complaint." *In re Galileo*, 127 F.Supp.2d at 261 (citations omitted).

**B. Application of Pleading Standards to Amended Complaints**

■ Each allegation of securities fraud must be examined independently as to whether it satisfies the requirements of Rule 9(b) and the PSLRA. *See In re Galileo*, 127 F.Supp.2d at 262. A statement-by-statement analysis is required, "in which the inquiry made is restricted to the immediate context of each statement— namely, the balance of what was said on the particular occasion, and the immediate circumstances in which the particular statement was made. . . . It is not the law that a 10b–5 complaint is to be judged on

---

**9.** Some courts have held that a "strong inference" of scienter can be shown merely by pleading facts establishing motive and opportunity to commit fraud. However, the First Circuit has rejected this interpretation of the PSLRA, and has held that evidence of motive and opportunity, without more, could not establish a strong inference of scienter. *Greebel*, 194 F.3d at 197. However, the *Greebel* court also stated that evidence of motive and opportunity is relevant in determining whether plaintiffs have sufficiently pled scienter. *See id.*

the basis of the general flavor derived from an issuer's collective statements over a long period of time." *Id.* (quoting *In re Boston Tech. Inc. Sec. Litig.*, 8 F.Supp.2d 43, 55–56 (D.Mass.1998); also citing *Shaw*, 82 F.3d at 1219–21).

## II. RIDEL'S SECOND AMENDED COMPLAINT

The essence of Ridel's claims is that the defendants made materially false and misleading statements and greatly overstated Focus' financial results in violation of generally accepted accounting principles (GAAP) in order to inflate the price of Focus' stock artificially. According to Ridel, defendants' motives were to use overvalued Focus stock to finance acquisitions and raise capital, as well as to increase their personal performance bonuses and stock options.

### A. False and Misleading Sales and Accounting Practices

Ridel alleges a pattern of improper revenue recognition and manipulative sales practices that Focus used to inflate reported sales fraudulently. According to Ridel, Focus engaged in "channel-stuffing" and recorded those sales as revenue, despite the resellers' unlimited right of return. Focus also allegedly warehoused goods in order to book them as sales, and then "returned" them.

#### 1. *The Statements*

##### a. *Information Provided By Former Employees*

Ridel identifies Adam Cogley, a buyer and the assistant director of operations at Focus from April to July of 1998, as the source of Ridel's allegation that, between April and July 1998, defendants loaded Focus products onto rented UPS and Yellow tractor trailers in order to comply technically with the requirement that an order must be FOB, or out of the warehouse, before it can be booked as income. (Ridel 2d Am. Compl. ¶ 36(a).) According to Cogley, on the last day of every month while he was employed at Focus, all "operations" employees were expected to stay all night or all weekend to ensure that Focus made its sales numbers. Approximately 60% of all monthly sales were recorded on the final day of the month, and Cogley alleges that approximately 50–75% of these last-minute orders were no more than paper transactions to inflate revenue. (*Id.* ¶ 56.) The products were unloaded from the trucks and processed as "returns" shortly after the month-end or quarter-end reporting period closed. These transactions were allegedly supervised by Mike LaFleur, director of operations and Cogley's immediate supervisor, who reported directly to Massie. Ridel 2d Am. Compl. ¶ 94(d). Ridel also relies on Cogley's statement that Massie occasionally visited the warehouse to observe the loading and unloading of the trailers. (*Id.* ¶¶ 36(a), 94(e).) Finally, according to Malika Bounaira,[10] a former Focus sales representative, Massie told her that Focus recognized income as soon as product was loaded on the trailer. (*Id.*)

Bounaira also allegedly states that Focus booked as "sales" products sent to distributors such as Ingram Micro, Micro-Warehouse, and DNH, even though the orders were subject to a right of return and "price protection." (Ridel 2d Am. Compl. ¶¶ 36(b)-(c).) According to Boun-

---

**10.** Bounaira was allegedly employed at Focus during at least a portion of the Class Period. She reported to Rick O'Connell, Vice President of Sales, who in turn reported directly to Massie. Bounaira allegedly had conversations with both O'Connell and Massie concerning Focus' revenue recognition policy. (Ridel 2d Am. Compl. ¶¶ 94(b), 94(g), 94(h).)

aira, Ingram Micro's contract with Focus specifically permitted returns of products that did not sell through. (*Id.* ¶ 36(b).) Carleton Van Putten, director of marketing until "sometime in 1998," confirms that Focus regularly booked revenue on shipments subject to a right of return. (*Id.* ¶¶ 36(b); 94(j).) Furthermore, Cogley states that Focus booked "inflationary orders"[11] as immediate sales and shipped goods to customers in advance of the contracted-for delivery. (*Id.* ¶¶ 36(d)-(e).)

Bounaira states that at the end of the 1997 third quarter, Focus booked as "sales" a 500–unit shipment to Ingram Micro, of which 498 units were returned. Ridel alleges that because "Massie, and other top Focus executives, had access to the Ingram BOS [BACK Order System] which tracked sell-through to final customers ... defendants knew or were reckless in not knowing that virtually all of the 500 TView Gold units were going to be returned." (Ridel 2d Am. Compl. ¶ 46.)

According to Van Putten, Focus commonly carried over from quarter to quarter marketing expenses, bad inventory allowances, and reserves for products sold with a high probability of return. (Ridel 2d Am. Compl. ¶ 36(f).) As Ridel characterizes Van Putten's statements, these carry-overs "permitted the Company to skate close to the edge and squeak out a few pennies of profit at the end of interim quarters ... [but] the Company's accountants would not permit them [for end-of-year reporting]." (*Id.* ¶ 36(g).) Ridel also cites information provided by Bounaira, Van Putten, and Alan Scott Gibbons,[12] that

Focus held a large inventory of obsolete Preso cards, which Focus allegedly did not write off until the end of the Class Period. (*Id.* ¶ 36(g).) Ridel relies on Bounaira's allegation,[13] corroborated by Van Putten, that Focus booked as revenue a $2 million sale, which included the obsolete Preso cards, to Ingram Micro on March 31, 1998, even though the shipment was subject to a right of return and price protection and included an obsolete product. (*Id.* ¶¶ 36(g), 53.) Finally, Bounaira alleges that during the Class Period, Focus sold products to a fictitious customer—a store owned by a Focus employee named Jason Lew. (*Id.* ¶ 36(h).)

Ridel also alleges that Focus improperly recorded revenues on sales where it was unable to make reasonable estimates of returns. (Ridel 2d Am. Compl. ¶ 36(i)-(j).) Ridel cites relationships with resellers such as Ingram Micro and Staples, who had rights of return and "price protection guarantees that made the price at sale to ultimate consumer difficult, if not impossible, to determine." (*Id.* ¶ 36(i).) Furthermore, Ridel contends that Focus could not make reasonable estimates of returns on products shipped to superstore retail chains, primarily because this was a new channel for Focus with which it had little experience and because the chains were granted long-term or unlimited rights of return. (*Id.* ¶ 36(j).)

b. *Publicly Available Information*

In a July 17, 1997 press release, Focus reported "record" financial results for the

---

11. "Inflationary orders" are deliberate overshipments of actual orders by customers. (Ridel 2d Am. Compl. ¶ 36(d).)

12. Gibbons was employed at Focus during at least a portion of the Class Period. He served as Chairman of the New Product Introduction Committee, which met weekly, and attended monthly meetings of the Product Committee

as well as quarterly management meetings. (Ridel 2d Am. Compl. ¶¶ 94(b), 94(i).)

13. Bounaira entered Ingram's purchase order number and the specifics of the order into Focus' computer system. (Ridel 2d Am. Compl. ¶ 53.)

three and six month periods ended June 30, 1997 and a 268% increase in its PC–to–TV revenues for the same period in 1996. Massie stated, "We have made tremendous progress in our turnaround efforts, and remain committed to significant growth and financial improvement. We are pleased with the market's rapid acceptance of our PC–to–TV product line and are excited about our future in the upcoming HDTV arena." (Ridel 2d Am. Compl. ¶¶ 39–40; Defs.App. 1.) Ridel alleges that Massie's statements were "false and materially misleading because defendants knew or recklessly disregarded that the Company's reported earnings were materially overstated." (Id. ¶ 41.)

On October 20, 1997, Focus again reported "record results," including a 513% increase in PC–to–TV product shipments over its 1996 third quarter, and a sales "backlog" of $2.7 million. (Ridel 2d Am. Compl. ¶ 44; Defs.App. 9.) Ridel alleges that reporting the backlog "suggested to investors that demand for Focus' products remained very strong and that such 'backlog' would convert to 'sales' in the coming quarters." (Id. ¶ 44.) Massie also referred to the "considerable interest from leading distributors for our PC–to–TV product line," which Ridel alleges was false or materially misleading because the "interest" was artificially generated through false revenues. (Id. ¶¶ 45–46.)

On February 27, 1998, Focus released its fourth-quarter and year-end 1997 financial results, announcing a 39% increase over 1996 sales and an 11% decrease in fourth quarter sales. (Ridel 2d Am. Compl. ¶ 49; Defs.App. 14.) Ridel alleges that Focus' reported financial statements were false and materially overstated. (Ridel 2d Am. Compl. ¶ 50.)

On April 16, 1998, Focus released its first quarter results, announcing a 9% increase in net sales over the first quarter of 1997. It attributed the increase primarily to "strong acceptance of the Company's PC–to–TV product line in the global consumer retail, VARs, mail order channels." (Ridel 2d Am. Compl. ¶ 51; Defs.App. 18.) Ridel alleges that Focus' stated reasons for the reported increase in sales were false and/or materially misleading because defendants were "artificially creating the appearance of acceptance...." (Id. ¶ 52.)

On July 20, 1998, Focus announced second quarter net sales of "a record $6,872,100, an increase of 12% from Q2 of 1997." (Ridel 2d Am. Compl. ¶ 54; Defs. App. 26.) The increase was attributed to "acceptance of the Company's PC–to–TV products in the global consumer retail, VAR, mail order and OEM channels." (Ridel 2d Am. Compl. ¶ 54.) Again, Ridel contends that the defendants' proffered reasons for the sales increase were false or misleading, because "defendants had no reasonable basis on which to estimate returns for products shipped to computer superstore chains," and based on Cogley's statement that on the last day of every month between April and July of 1998, Focus booked "paper" sales to inflate its monthly revenue figures and that approximately 60% of monthly sales were recorded on the last day of the month. (Id. ¶¶ 55–56.)

On August 21, 1998, Focus issued a press release denying knowledge of any reason for its declining stock price. Massie referred to Focus' "record financial results" announced in July 1998, and noted that the "balance sheet is the strongest in its history." (Ridel 2d Am. Compl. ¶ 57.) Ridel alleges that these statements were false and/or materially misleading. (Id. ¶ 58.)

On October 26, 1998, Focus reported a 5% increase in third quarter sales from the 1997 third quarter, which Focus characterized as noteworthy given the 76% decline

in OEM sales. (Ridel 2d Am. Compl. ¶ 61; Defs.App. 29.) Focus also reported a 76% increase in accounts receivable, "reflecting the 103% growth in the Company's reseller sales channel," and an 18% decline in inventory, "reflecting better forecasting and inventory disciplines." (*Id.* ¶ 61.) Ridel alleges that these statements were false and misleading because Focus inventory had actually grown and would have to be written down by almost $1.8 million, and because "defendants had no reasonable basis on which to estimate returns for products shipped to computer superstore chains like Staples or distributors like Ingram Micro...." (*Id.* ¶ 62.)

Ridel alleges that the above financial results were materially overstated based on improper recognition of revenue in violation of GAAP. In fact, Ridel states that the accounting violations were so "massive" that returns exceeded total sales in the fourth quarter of 1998 by almost $1 million. Ridel contends that the defendants "either knew the 'buyer' would return [the products] if not resold to end-users or were reckless with regard to such a likelihood." (Ridel Mem. Opp'n. at 4.)

Ridel also contrasts the language in the Summary of Significant Accounting Policies set forth in Focus' 1997 Form 10–K with its 1998 Form 10–K. In 1997, the Summary provided that revenue from sales to distributors "may be subject to *limited* rights of return and price protection." (emphasis added) (Ridel 2d Am. Compl. ¶ 102). In 1998, the Summary stated, "Revenue from sales to distributors may be subject to rights of return and price protection." (*Id.* ¶ 103.) The omission of the word "limited" regarding revenue recognition was not explained. (*Id.*) Ridel contends that the 1997 Form 10–K representation that distributors were granted only "limited" rights of return was false and misleading in that Focus "actual-

ly allowed customers, including Ingram Micro, Staples and other retail superstores to return products in lieu of payment regardless of amount or the passage of months since the original shipment of the merchandise." (*Id.* ¶ 117.)

Finally, Ridel contends that, based on FAS 48 and APB Opinion No. 20, Focus should have restated its financial results for the first three quarters of 1998 instead of making fourth quarter adjustments. (Ridel 2d Am. Compl. ¶ 135.) In support, Ridel argues that Focus improperly recorded revenues on shipments that did not meet the FAS 48 recognition criteria and were material to the prior quarterly results in 1998, and finally that the "correction of the error in prior quarterly periods would materially affect a trend in earnings between both prior periods and following periods." (*Id.*)

### 2. *Analysis*

#### a. *Basis for Knowledge*

To survive the motion to dismiss, Ridel must demonstrate that his allegations rest on more than mere "information and belief." *Lirette v. Shiva,* 27 F.Supp.2d 268, 276 (D.Mass.1998). To comply with the pleading requirements of Rule 9(b) and the PSLRA, Ridel must set forth the particularized facts upon which his information and belief are based. *See* 15 U.S.C. § 78u–4(b)(1); *Chalverus v. Pegasystems, Inc.,* 59 F.Supp.2d 226, 232–33 (D.Mass. 1999). He cannot rely on hindsight to infer that the problems resulting in the $12.7 million net loss announced on February 19, 1999 were known and fraudulently concealed by the defendants during the Class Period. *See Gross,* 93 F.3d at 991 ("we have consistently held that a securities plaintiff does not satisfy the requirements of Rule 9(b) merely by pleading 'fraud by hindsight' ").

The defendants contend that Ridel has not described his informants' positions in the company with sufficient particularity to justify reliance upon their knowledge. (Defs. Mem. Supp. M. Dismiss 2d Compl. at 4.) With respect to Cogley, defendants argue that Ridel failed to allege that Cogley had any duties relating to the shipping or loading dock or that he was in a position to know whether and when products were shipped or returned. (*Id.* at 5.) As for Bounaira, because Ridel did not explain how "an international sales representative would have such accounting knowledge," defendants contend that any knowledge of how sales are booked, alleged rights of return/price protection, alleged "fictitious" sales, or a domestic shipment to Ingram Micro can only be based on hearsay, and as such is insufficient under Rule 9(b). (*Id.*) Defendants further argue that, because of his position, Van Putten is only qualified to make allegations about Focus marketing. Finally, defendants state that Gibbons' allegations must be treated as hearsay because Ridel fails to plead that Gibbons was on the New Product Introduction Committee at the relevant times. (*Id.* at 6.)

I afforded Ridel an opportunity to amend his complaint to describe his previously unnamed sources with greater particularity. In his Second Amended Complaint, Ridel both names his sources and provides a general description of their former positions at Focus. The defendants' argument that Ridel has failed to describe the basis for informant allegations with sufficient particularity appears to be grounded on a misreading of the existing case law concerning the use of unnamed sources in securities fraud actions.[14] In *Fitzer v. Security Dynamics Technologies,*

119 F.Supp.2d 12, 22 (D.Mass.2000), Judge Young held that "there is no requirement that [personal sources] be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* (quoting *Novak v. Kasaks,* 216 F.3d 300, 313 (2d Cir. 2000)). Ridel has now in fact named the sources in the complaint and has identified their former positions. At this stage in the proceedings, Ridel may rely upon their purported knowledge to support his allegations. I find on the motion to dismiss record the identified informants are likely to have such knowledge. Actual factual disputes about the extent of or basis for their knowledge must await subsequent proceedings in this case.

### b. *Channel Stuffing*

Ridel alleges that defendants engaged in "channel stuffing," a practice whereby a company induces purchasers to "increase substantially their purchases before they would, in the normal course, otherwise purchase products from the company." *Greebel,* 194 F.3d at 202. Such a practice enables the company to shift earnings into earlier quarters. *See id.; Fitzer,* 119 F.Supp.2d at 34.

As the First Circuit has stated, there is "nothing inherently improper in pressing for sales to be made earlier than in the normal course." *Greebel,* 194 F.3d at 202. Ridel contends, however, that the evidence of channel stuffing supports the inference that management deliberately engaged in undisclosed manipulating in order to inflate income through improper revenue recognition. *See id.* at 202–03.

---

**14.** I note that the use of anonymous informants in a complaint remains an open question in the First Circuit.

In a similar context, the First Circuit held that evidence of channel stuffing has some probative value but does not support a "strong inference" of scienter, because "there may be any number of legitimate reasons for attempting to achieve sales earlier." *Id.* at 203; *see also Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 282–83 (D.Mass.1998) (channel stuffing and related allegations do not support a "strong inference" of scienter under Rule 9(b) and PSLRA).

Ridel makes general allegations relating to channel stuffing activity, but, even with support from his witnesses, offers no evidence to show that defendants, apart from inventory parking and improper revenue recognition, knew about or recklessly disregarded fraudulent channel stuffing. I turn then to the inventory parking and revenue recognition issues.

c. *Inventory Parking*

■ Ridel's allegation that defendants caused to be booked as sales products that were stored in trailers in Focus' warehouse and recognized revenue from such phony sales is, if true, plainly actionable. *See Greebel,* 194 F.3d at 202. Given the information provided by Cogley, in addition to his assertion that Massie occasionally visited the warehouses during the loading of the trucks, I find that the allegations concerning this alleged scheme gives rise to a "strong inference" of scienter sufficient to survive the motion to dismiss.

d. *GAAP Violations and Revenue Recognition*

■ Ridel alleges that Focus engaged in improper revenue recognition on its financial statements during the Class Period, in violation of GAAP. Specifically, Ridel alleges that during the Class Period, Focus recorded as "sales" transactions including a right of return, which did not meet the requirements for revenue recognition set forth in FAS 48.

As a general rule, GAAP violations, absent "other circumstances" indicative of fraudulent intent, do not give rise to a "strong inference" of scienter. *Greebel,* 194 F.3d at 205; *see also Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 362 (1st Cir.1994); *Gelfer v. Pegasystems, Inc.,* 96 F.Supp.2d 10, 14 (D.Mass.2000); *In re Peritus,* 52 F.Supp.2d at 223 ("failure to recognize revenue in accordance with GAAP does not, in itself, suffice to establish scienter"). Generally accepted accounting principles "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Greebel,* 194 F.3d at 205 (citation omitted).

FAS 48 governs revenue recognition where the buyer has the right of return. In such instances, the seller may recognize revenue from the transaction only if all of the following conditions are met:

a. The seller's price to the buyer is substantially fixed or determinable at the date of sale.

b. The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.

c. The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.

d. The buyer acquiring the product for resale has economic substance apart from that provided by the seller.

e. The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.

f. The amount of future returns can be reasonably estimated.

*In re Milestone Scientific Sec. Litig.*, 103 F.Supp.2d 425, 467 (D.N.J.2000) (citing FAS 48 at ¶ 6). Under FAS 48, the granting of a right of return in a particular transaction, or even a general policy of granting return rights, does not per se mean that revenue cannot be recognized at the time of sale.

Ridel sets forth, but just barely, facts showing that Focus failed to meet the FAS 48 conditions. Fairly—perhaps indulgently—read, the Second Amended Complaint alleges that payment was contingent upon resale given the character of the resellers' right of return. Ridel cites a specific agreement, relying on Bounaira's statement that the Ingram Micro contract provided for a right of return. Ridel also refers to Bounaira's allegation, corroborated by Van Putten, that Focus booked as revenue a $2 million sale, which included obsolete Preso cards, to Ingram Micro on March 31, 1998, even though the shipment was subject to a right of return and price protection and included an obsolete product. To be sure, Ridel does not allege that Ingram Micro did not pay Focus. Nor does Ridel allege that any of the products were in fact returned, or that Focus set improper return reserve estimates. But Ridel does allege, based on Cogley's knowledge, that Focus booked "inflationary orders" as immediate sales and shipped goods to customers in advance of the contracted-for delivery. I recognize, however, that he cites no actual transaction in which such practices occurred.

Ridel does not allege that the right of return contravened established Focus policies. Ridel merely cites as evidence the fact that Focus recognized revenues upon the sale of products to resellers. Ridel's reliance on the omission of the word "limit-ed" in describing the right of return in the 1998 Form 10–K does not significantly fortify the claim. Similarly, Ridel's unsupported allegation that Focus was unable to make reasonable estimates of returns does not materially advance the claim. Without any information on Focus' past return rates, the size of its reserve, or how the reserve changed over time, it is difficult to infer on that basis that Focus' decision to recognize revenue upon sale to resellers instead of to end-users violates GAAP or gives rise to a strong inference of scienter.

Nevertheless, the alleged violations are described with sufficient particularity. I recognize that "a general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation." *Greebel,* 194 F.3d at 203–04 (quoting *Gross v. Summa Four, Inc.,* 93 F.3d 987, 996 (1st Cir.1996)). Ridel fails fully to specify "such basic details as the approximate amount by which revenues and earnings were overstated; the products involved in the contingent transactions; the dates of any of the transactions; or the identities of any of the customers or [ ] employees involved in the transactions." [15] *Greebel,* 194 F.3d at 204 (citations omitted); *see also Lirette v. Shiva Corp.,* 27 F.Supp.2d 268, 277 (D.Mass.1998) (citation omitted); *Gross,* 93 F.3d at 996 (dismissing allegations of revenue overstatement because plaintiff had not alleged the amount of the alleged overstatement or the net effect it had on the company's earnings).

Yet, while Ridel fails generally to allege which resellers returned Focus products, the Ingram Micro shipment is adequately alleged to permit the theory to be pursued. According to Bounaira, at the end of the

15. While each of these particulars need not appear in the complaint, the First Circuit has stated that "their complete absence ... is indicative of the excessive generality of these allegations." *Greebel,* 194 F.3d at 204.

1997 third quarter, Focus booked as revenue a 500–unit shipment to Ingram Micro of its TView Gold product. (Ridel 2d Am. Compl. ¶ 46.) Based on defendants' alleged access to the Ingram BOS which tracked sell-through, Ridel draws the inference that the defendants "knew or were reckless in not knowing that virtually all of the 500 TView Gold units were going to be returned." (*Id.*) Of course, this allegation does not specify when the units were returned or the specified reason for the return but the nature of the transaction can, at this stage, be treated as evidentiary of a broader pattern.

Although GAAP violations alone do not establish a strong inference of scienter, they may do so when combined with other circumstances establishing fraud. *Chalverus*, 59 F.Supp.2d at 233–34; *Gelfer*, 96 F.Supp.2d at 14–15; *In re Digi Intern. Sec. Litig.*, 6 F.Supp.2d 1089, 1098 (D.Minn.1998). These other circumstances include "(1) the magnitude of the overstatement of revenue and earnings; (2) the omission in public statements of material facts related to the GAAP violations and (3) the defendants' motives to overstate income." *Greebel*, at 201–02. However, a "restatement of earnings, without more, does not support a 'strong inference' of fraud, or for that matter, a weak one." *In re Segue*, 106 F.Supp.2d at 169; *see also Chalverus*, 59 F.Supp.2d at 234. Nevertheless, given the magnitude of the $12.7 million loss reported on February 19, 1999, and the instances of manipulation in violation of GAAP which the named informants assert, I find that Ridel's Amended Complaint has alleged with requisite particularity facts to support a strong inference of scienter sufficient to move ahead with discovery.

## B. New Product Announcements

 Ridel's Second Amended Complaint also alleges that Focus press releases contained false or misleading statements about several planned product launches, when both Focus and the individual defendants "knew or recklessly disregarded present facts showing that such products would not ship to customers" when promised. (2d Am.Compl.¶¶ 63–69.)

### 1. The Statements

On July 17, 1997, Focus reported that shipment of the new FS300 chip would be delayed until October of 1997. On December 11, 1997, Focus again announced shipment delays. Relying on Gibbons' statement that the defendants prematurely announced the development and anticipated shipment date of the FS300 product,[16] Ridel alleges that Focus materially misled investors about the status of its products. (Ridel 2d Am. Compl. ¶¶ 68–69.)

On May 21, 1998, Massie announced a third quarter 1998 launch date for TView I–Net. (Ridel 2d Am. Compl. ¶ 64; Defs. App. 21.) According to Gibbons, at the time of Massie's announcement, the product market had not been validated, the product had not been "spec'ed" and it had not been determined if the project would actually work. (Ridel 2d Am. Compl. ¶ 65.) Ridel alleges that Massie deliberately scheduled the announcement to maximize investor interest in Focus and induce investors to exercise their warrants. (*Id.*)

On May 27, 1998, Focus announced that the CybArcade TV would begin shipping on July 1, 1998. (Ridel 2d Am. Compl. ¶ 66; Defs.App. 23.) Cogley allegedly stated that the CybArcade product was "nowhere near being ready to ship on July 1, 1998," and that Focus did not even enter

---

**16.** According to Gibbons, one of the problems with the FS300 was its flawed design—it was built with too much "external logic" which increased costs. (Ridel 2d Am. Compl. ¶ 69.)

into a contract for packaging until late June or early July of 1998. (Ridel 2d Am. Compl. ¶ 67.)

#### 2. *Analysis*

Statements concerning a product launch date are non-actionable when accompanied by cautionary language. *Fitzer*, 119 F.Supp.2d at 31. Where a product is clearly in development, "plaintiffs may not assert merely that, because the product did not come out when projected, plans for an earlier release were false." *Berliner v. Lotus Dev. Corp.*, 783 F.Supp. 708, 710 (D.Mass.1992). Finally, optimistic predictions "that prove to be off the mark" are not actionable unless the plaintiff shows intentional deception by the defendants at the time the statement was made. *Serabian*, 24 F.3d at 361; *see also In re Boston Technology*, 8 F.Supp.2d at 54.

Even considering the statements of Ridel's informants, I cannot conclude that the defendants had reason to know on the dates of the press releases that the product launches would not occur on schedule. They were at most unduly optimistic. Ridel's allegations do not establish a strong inference of scienter.

#### C. False and Misleading Statements Regarding Market Acceptance

■ Ridel alleges that Focus issued a number of press releases about agreements with resellers and manufacturers that fraudulently created the appearance that sales growth was due to market acceptance of the Focus product line rather than to channel stuffing and improper revenue recognition.

#### 1. *The Statements*

Ridel alleges that Focus issued press releases "touting" new agreements with resellers, such as Egghead Software, Army Airforce Exchange, Micro Center,[17] PictureTel,[18] Toshiba,[19] Staples,[20] CompUSA, Computer City,[21] Dixons Stores Group UK, OfficeMax, and PORT, Inc. to fraudulently create "the appearance of market acceptance of its PC–to–TV conversion products." (Ridel 2d Am. Compl. ¶¶ 74–82, 85–90.) Ridel alleges that Focus issued these press releases despite "defendants' knowledge that there was little interest from end-users; such products would likely be returned by the resellers; resellers had the right to return products that did not sell-through; and, Focus would have to take an extraordinary charge to write-off such products." (*Id.* ¶ 77.)

A Focus press release issued on October 20, 1997 emphasized Focus' success in developing "further awareness of the PC–to–TV video convergence category through

---

**17.** Focus Vice President of Channel Development, Richard O'Connell, stated that "Micro Center further expands our base of resellers and strengthens FOCUS' position as the leader in the PC–to–TV industry." (Defs.App.4.)

**18.** Defendant Moyer said that, "PictureTel is an important Partnership for FOCUS Enhancements. The video conferencing market presents a large opportunity for our quality PC–to–TV convergence technology." (Defs.App.5.)

**19.** FOCUS Vice President of Business Development, Tom Hamilton, stated, "The Preso-

Card's price and quality features are the primary factors behind Toshiba's decision to feature the product in its Noteworthy catalog." (Defs.App.6.)

**20.** O'Connell stated, in reference to the Staples agreement, that, "this will be a great partnership." (Defs.App.12.)

**21.** O'Connell stated, "Computer City's acceptance of the Tview Gold and Silver continues to validate FOCUS' performance and price model for PC–to–TV products." (Defs.App.15.)

strategic distribution agreements with leading resellers." Massie stated that Focus was "receiving considerable interest from leading distributors for our PC–to–TV product line, as evidenced by the flurry of agreements we finalized during the past two months." (Ridel 2d Am. Compl ¶ 45; Defs. Am. Answer 9.) Ridel alleges that these statements were false or materially misleading because distributor interest was "artificially generated through false revenues." (*Id.* ¶ 46.) Moreover, on February 23, 1998, Moyer stated that the "exceptional performance of the TView Gold is getting the attention of the major players in the retail channel and the sell-through is very good." (*Id.* ¶ 93.) Ridel alleges that this statement was made when the sell through was in fact "practically nonexistent." (*Id.*)

Focus announced in separate press releases that two large television manufacturers, Philips and Samsung, had agreed to use Focus PC–to–TV products in their television sets.[22] Ridel states that, in both cases, information about the value of the contracts or how many televisions would be pre-installed with Focus products was "notably absent." Bounaira alleges that Focus announced its agreement with Philips before it actually had a purchase order from Philips. Van Putten alleges that Focus only made several thousand PC–to–TV prototype cards for Philips before Philips cancelled the deal. (Ridel Am. Compl. ¶¶ 70–72; 83.)

On May 5, 1998, Focus announced that Compaq had selected Focus products as its PC–to–TV video solution for its Government, Educational and Medical vertical markets. (Ridel 2d Am. Compl. ¶ 84; Defs.App. 20.) On May 26, 1998, Focus announced that FurtherTech Co. Ltd. had

begun incorporating Focus products into its video scan converters. (Ridel Am. Compl. ¶ 85; Defs.App. 22.)

### 2. *Analysis*

Ridel identifies with sufficient particularity the allegedly fraudulent statements, the speaker, and when the statements were made. *See Suna,* 107 F.3d at 68. To survive a motion to dismiss, however, he must also explain why the statements were false or misleading, and must allege facts giving rise to a strong inference that defendants knew, or recklessly disregarded, that the statements were false or misleading at the time they were made. *See Greenstone,* 975 F.2d at 25–27.

Ridel alleges that the press releases were fraudulent because they attempted to create the false impression of increased market acceptance and consumer demand, when defendants knew that the agreements with resellers were being used merely to "stuff" the channel with unwanted products to inflate revenues. These allegations are conclusory in nature and are based on impermissible theory of fraud by hindsight. Ridel alleges almost no contemporaneous facts supporting an inference that Focus products were not selling through or that defendants at the time of the statements knew them to be false or misleading. The only actual transaction involving returns cited in the Amended Complaint is the return of 498 units of a 500–unit order by Ingram Micro. (Ridel 2d Am. Compl. ¶ 46.) This transaction is not sufficient to give rise to a strong inference that defendants knew at the time of the press releases that Focus products were not gaining in market acceptance. Ridel primarily relies on the February 19,

---

**22.** On April 7, 1998, Focus announced that it had begun shipping its PC–to–TV technology to Philips. On April 16, 1998, Focus announced that Samsung had agreed to use Focus' products in future PC–to–TV products.

1999 announcement of the $12.7 million loss, due to problems with resellers, to support his allegation that Focus products were not selling. An earnings restatement, while it may be material, does not create an inference of scienter.

Although general optimistic statements by management, without more, are not material misrepresentations, if defendants misrepresented the extent of product demand to make Focus appear healthier, Ridel's claim may have merit. *See Fitzer*, 119 F.Supp.2d at 23. However, Ridel fails to show "how or why defendants should have known the descriptions were inaccurate," *Serabian*, 24 F.3d at 365, or any other facts suggesting knowing falsity in any of Focus' optimistic statements about its future prospects or its reseller partnerships. Accordingly, I find Ridel's claim is too generalized to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA.

## D. Analyst Statements

▆▆▆ Ridel seeks to impute statements made by Red Chip Review securities analysts to defendants. Ridel contends that the defendants are liable for false and misleading representations made in various analyst reports because these statements were either directly attributed to defendants or adopted by them. (Ridel Am. Compl. ¶ 26.)

### 1. *The Statements*

In the August 26, 1997 Red Chip Review report, the analyst stated that Focus had established a leadership position in the PC–to–TV market, had recently returned to profitability, and that the launch of the Focus Scan 300 in September would "significantly enhance its competitive position." (Ridel 2d Am. Compl. ¶ 42.) Ridel contends that, given the defendants' practices, the analyst's report, which was based

on information provided by defendants, was false and materially misleading. (*Id.* ¶ 43.)

The February 24, 1998 Red Chip Review report referred to information "that could only have come from management as it had not been publicly disclosed elsewhere." (Ridel 2d Am. Compl. ¶ 47.) The analyst predicted "another year of 50% revenue growth and enhanced margins due to lower chip costs as well as the leveraging of operating costs on higher sales." (*Id.*) The report also stated that the "Company expects the addition of Staples' 582 stores could generate $4 to $6 million of incremental business in 1998." (*Id.*) Ridel alleges that defendants, in providing this false and materially misleading information to the analyst, knew or recklessly disregarded Focus' inflated revenues and "undisclosed strategy to 'stuff the distribution channel.'" (*Id.* ¶ 48.)

The August 25, 1998 Red Chip Review report noted the "considerable buildup in accounts receivable associated with the expansion of the retail distribution channels. . . . However, there could be a significant opportunity for stock recovery in the coming months if the Company demonstrates that its products have solid sell through and accounts receivable are reduced to industry standard levels, and that it is not merely packing the channels." (Ridel 2d Am. Compl. ¶ 59.) Ridel again alleges that defendants provided false and misleading information to the analyst. (*Id.* ¶ 65.)

Ridel alleges that the November 10, 1998 Red Chip Review report, which stated that "we did not get an opportunity to speak with management while writing this report," corroborates Gibbons' statement that management spoke with and supplied confidential information to analysts for prior Red Chip reports. (Ridel 2d Am. Compl. ¶ 118.) The analyst expressed con-

cern about Focus' accounting practices, and questioned if "the Company is filling its retail channel without increasing its return reserves...." (*Id.*)

On February 9, 1999, the Red Chip analyst stated that "the PC TView Gold product was not selling through at these office superstores and that the sales figures may have been inflated by filling its retail distribution channels." (*Id.* ¶ 119.)

### 2. Analysis

The First Circuit has not yet decided whether analyst reports may be attributed to a defendant company. *See Suna,* 107 F.3d at 73. However, the majority of courts to address this issue have held that to impute analyst statements to the defendants, the complaint must allege "entanglement" of the company with the analyst. *See In re Boston Tech., Inc. Sec. Litig.,* 8 F.Supp.2d 43, 58 (D.Mass.1998). Courts have generally required that the plaintiff allege that, "(1) the issuer 'entangled' itself in the making of a statement by the analyst; (2) the issuer knew that the statement (commonly a prediction) was false or lacked a reasonable factual basis when made; and (3) the issuer failed to disclose the falsity or the unreasonableness to investors." *Id.,* at 55.

The First Circuit has indicated that allegations of entanglement must, pursuant to Rule 9(b), be made with sufficient particularity. *See Suna,* 107 F.3d at 73. Thus, Ridel must (1) specify the allegedly fraudulent statements; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent. *Id.* The First Circuit has held that an allegation that it was company practice to have top managers "communicate regularly with securities analysts ... and to provide detailed 'guid-

ance' to these analysts with respect to the Company's business," is insufficient. *Id.*

In this case, applying Rule 9(b) to the analyst statements requires that Ridel allege with particularity the time, place, speaker, and content of what was said by Focus management to the analysts that would have induced them to make the allegedly misleading reports. *See Id.* Ridel fails to do so. Ridel alleges that "defendants directly met or communicated with analysts and provided detailed and direct guidance to them regarding the Company's business condition and prospects." (Ridel 2d Am. Compl. ¶ 27.) Ridel also cites Gibbons' statement that "Massie visited the Red Chip Review's Oregon offices each time he visited Focus' West Coast offices and met with analysts and reviewed drafts of research reports." (*Id.* ¶¶ 27, 37.) Gibbons allegedly knew about these visits because he lived in Oregon, near Red Chip's offices, and Massie would visit him when he visited Red Chip's offices. (*Id.* ¶ 27.) Finally, Ridel alleges that defendants "expressed comfort" with the earnings estimates contained in analyst reports, thus entangling themselves in the contents of the reports. (*Id.*)

While I accept as true Ridel's statement, on the basis of Gibbon's knowledge, that Massie did meet with Red Chip analysts, the mere fact that meetings occurred, without more, does not suffice. Nor am I persuaded by Ridel's assertion that the statement in the November 10, 1998 Red Chip Review report—"we did not get an opportunity to speak with management while writing this report"—corroborates Gibbons' statement that Focus management did speak with analysts for prior Red Chip reports. (Ridel 2d Am. Compl. ¶ 118.)

Ridel's claim must fail because he provides no specifics about the content of

these alleged meetings or the specific dates on which the alleged conversations between Massie and Red Chip analysts occurred. In fact, no actual statement by any defendant to any analyst is identified anywhere in the Amended Complaint or Ridel's briefing. Based on the Second Amended Complaint, it appears that none of the analysts directly quoted or paraphrased any Focus officers, nor did they make reference to allegedly misleading information provided by the company or to any involvement by Focus or its officers in the preparation or approval of the report. Accordingly, these analyst statements cannot be attributed to the defendants. *See Suna*, 107 F.3d at 73–74.

### E. Section 20(a) Violation

■ Count II of the Second Amended Complaint alleges that the individual defendants violated § 20(a) of the Exchange Act. Section 20(a) provides a cause of action against any person who "controls" a corporation that violates the securities laws. *See* 15 U.S.C. § 78t(a). Therefore, to state a claim under § 20(a), plaintiffs first must allege an independent violation of the securities laws. *See Fitzer*, 119 F.Supp.2d at 16 n. 2 (citing *Suna*, 107 F.3d at 72).

Because I have determined that Ridel has pled a primary violation of § 10(b) or Rule 10b–5 with respect to inventory parking and revenue recognition, I will ALLOW the plaintiffs to move forward with respect to those allegations made in Count II of the Ridel Amended Complaint.

### IV. JAMES' SECOND AMENDED COMPLAINT

James alleges that defendants made material misrepresentations concerning Focus' ability to monitor inventory levels and reserve for returns adequately in 1999. Moreover, according to James, defendants "knew or recklessly disregarded" that control over inventory and returns was inadequate during the Class Period. (James 2d Am. Compl. ¶ 5.) James contends that defendants were motivated to misrepresent Focus' financial condition primarily in order to sell their own shares at artificially inflated prices. (*Id.* ¶ 11.)

The Amended Complaint sets forth in some detail Focus' history of accounting problems, including the resignation of its accountant in 1996, the $847,000 charge to earnings taken in 1995, repeated restatements of financial results, and the Company's $12.7 million loss for 1998. (James 2d Am. Compl. ¶¶ 41, 45, 49–51, 60, 63–65.) James contends that this pattern of past financial problems made the defendants "acutely aware" of the need for proper accounting and adequate reserves for product returns. (*Id.* ¶ 54.)

The only document cited in the Amended Complaint that was issued during the Class Period is Focus' amended Form 10–QSB/A for the third quarter of 1999, filed with the SEC on November 16, 1999. James alleges that the Form 10–Q contained false and misleading statements and omissions. I discuss these allegations below in some detail.

### A. Allegedly False and Misleading Statements

The Amended Third Quarter 10–Q was signed by defendants Massie and Cebula. (James 2d Am. Compl. ¶ 88.) The 10–Q stated that "[i]n the 99 Period, the Company continued to record provisions for potential future uncollectible accounts and continually monitors inventory levels at its resellers and maintains reserves for potential product returns." (*Id.* ¶ 90; Defs.App. 3 at 14.) James contends that this statement was materially misleading because,

(1) Focus did not maintain its reserves and monitor its inventory levels in accordance with GAAP, as evidenced by its "need to take a large charge in the fourth quarter to account for returns and write-down inventory," and (2) Focus lacked or ignored proper financial controls to monitor inventory levels at resellers and its inventory in general. (*Id.* ¶¶ 91, 118.)

## 1. GAAP Violations

### a. Establishment of Reserves

■ The establishment of reserves "entails a degree of unavoidable guesswork." *In re Segue Software*, 106 F.Supp.2d at 169. FAS 48 permits reliance on "many factors and circumstances" in making a "reasonable estimate of future returns." *Id.* Thus, the mere "failure to provide adequate reserves (or to perform competently other management tasks) does not implicate the concerns of the federal securities laws and is not normally actionable." *Serabian*, 24 F.3d at 363.

James relies primarily on the fact that Focus reported a $1.8 million charge for the fourth quarter of 1999 and a net loss of approximately $1.48 million for fiscal year 1999 to support his allegation that the Form 10–Q statement about the adequacy of reserves was fraudulent. (James 2d Am. Compl. ¶¶ 105, 110.) James' reliance on this evidence constitutes the impermissible theory of fraud by hindsight. *See Shaw*, 82 F.3d at 1223. The mere fact that Focus was proven wrong by fourth quarter results does not mean that, at the time the statement was made, the defendants knew that it was false and misleading. *See Greenstone*, 975 F.2d at 25–27. Even if Focus' prior history of restatements and charges to earnings is taken into consideration, without more, it does not give rise to a strong inference that defendants knew or recklessly disregarded the possibility that adequate reserves had not been taken in the third quarter of 1999.

James also cites several GAAP principles that he alleges were violated by defendants. (James 2d Am. Compl. ¶ 120.) GAAP violations, without more, do not support a strong inference of scienter. Similarly, "the mere assertion that the Defendants violated various provisions of GAAP, without providing any specific factual support, cannot meet the pleading requirements under the PSLRA." *In re Milestone*, 103 F.Supp.2d at 474. James fails to provide any specific examples of how these principles were violated in Focus' 1999 Third Quarter 10–Q. *See In re Oak Tech. Sec. Litig.*, 1997 WL 448168, *9 (N.D.Cal.1997) (plaintiff must allege facts sufficient to support a finding that the accounting decision is the result of fraud and not merely the difference between two permissible judgments"). Nor does James allege any facts giving rise to even a reasonable inference that the defendants had specific knowledge or recklessly disregarded information about prospective product returns that would make the statement in Focus' Form 10–Q intentionally misleading.

### b. Characterization of the Claim

■ To plead financial fraud based on improper revenue recognition under GAAP adequately, the complaint must allege, "at a minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, the terms of the specific transactions, when the transactions occurred, and the approximate amount of the [allegedly] fraudulent transactions." *Lirette*, 27 F.Supp.2d at 278. The Amended Complaint fails to allege what Focus' actual reserves were for the third quarter of 1999, how great the reserves should have been, *see Roots Part-*

*nership v. Lands' End, Inc.*, 965 F.2d 1411, 1419 (7th Cir.1992), any evidence of actual returns or uncollectibles that were not reserved, or the amount of the deficiencies in the reserves, *see Gross*, 93 F.3d 987, 996 (1st Cir.1996) (plaintiff "has not alleged the amount of the putative overstatement or the net effect it had on the company's earnings")

James responds that defendants have mischaracterized his claim as alleging financial fraud based upon improper revenue recognition. James asserts that because his claims are based not on financial performance but on the defendants' business practices, defendants are incorrect in asserting that the Amended Complaint must contain information about the actual amount of reserves, what they should have been, or what amount of product was returned. But the securities laws "do not guarantee sound business practices and do not protect investors against reverses." *See Serabian*, 24 F.3d at 361. Mere failure on the part of management to perform competently "does not implicate the concerns of the federal securities laws and is not normally actionable." *Id.* at 363 (citing *Shapiro*, 964 F.2d at 281.) Without more, therefore, this line of argument does not rise to the level of an actionable securities violation.

c. *Past Practices*

James contends that defendants' "past accounting misconduct weighs heavily on the issue of defendants' scienter, particularly where, as here, the allegations mirror the past violations." James argues that Focus' past accounting problems comprise a consistent pattern of Focus failing to monitor its inventory in accordance with GAAP. Defendants respond that because the past misconduct is remote in time and did not occur during the employment of certain of the defendants, fraudulent or

reckless conduct cannot be inferred from past problems with respect to Focus' November 1999 quarterly report.

██ "Evidence of past practice may indeed be probative of present practice." *Greebel*, 194 F.3d at 202; *see also In re Segue Software*, 106 F.Supp.2d at 169 (reviewing historical estimates and results in evaluating whether the estimates made during the class period were intentionally understated). A repetition of past practices may establish scienter. *See Greebel*, 194 F.3d at 202; *Gelfer*, 96 F.Supp.2d at 15. Furthermore, the magnitude and frequency of the restatements may support an inference of scienter. *Gelfer*, 96 F.Supp.2d at 16; *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir.2000) ("magnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect the errors"). In *Gelfer*, the court found that allegations of pattern of misconduct were, "strongly probative of scienter because the Defendants were on notice of the improper accounting practices giving rise to [*Chalverus*]." *Gelfer*, 96 F.Supp.2d at 15. James' allegations of past practices, however, without any evidence indicating that defendants knew or recklessly disregarded facts rendering the Form 10–Q statement false or misleading, does not give rise to a strong inference of scienter.

d. *The 1999 Restatement*

On August 15, 2000 (four days after the filing of the James Amended Complaint), Focus disclosed in an SEC filing that it needed to restate revenues for the second and third quarters of 1999. In a press release issued the same day, Focus disclosed that it expected the restatements to reduce revenue by $363,000 and $908,000, respectively. (James 2d Am. Compl. ¶¶ 9, 127.) James contends that in making this restatement, "Focus effectively admits that its originally reported results for those

quarters did not comply with the then effective GAAP principles." (*Id.* ¶ 128.) James further alleges that Focus inaccurately blamed the need for the restatements on SAB 101 [23] "rather than admit to investors that it failed to comply with GAAP." (*Id.*)

Focus filed SEC reports for the second and third quarters of 2000 in which it reiterated the need to restate its second and third quarter 1999 results in order to comply with SAB 101. (*Id.* ¶¶ 132–33.) On February 7, 2001, Focus filed its Form SB–2, disclosing that during the second quarter of 1999, it "failed to reserve any amount for potential inventory obsolescence or for repair of returned products during that quarter," whereas Focus reserved over $200,000 in the second quarter of 2000 to cover such eventualities. (*Id.* ¶ 136.)

As a general rule, GAAP violations, absent "other circumstances" indicative of fraudulent intent, do not give rise to a "strong inference" of scienter. *Greebel,* 194 F.3d at 205; *see also Serabian,* 24 F.3d at 362; *Gelfer,* 96 F.Supp.2d at 14; *In re Peritus,* 52 F.Supp.2d at 223 ("failure to recognize revenue in accordance with GAAP does not, in itself, suffice to establish scienter").

James fails to allege, with sufficient particularity, that "the defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *In re Galileo,* 127 F.Supp.2d at 261 (quoting *Maldonado,* 137 F.3d at 9 n. 4). The mere fact that the defendants chose to follow SAB 101 does

not necessitate an inference, let alone the requisite strong inference, that defendants deliberately reported false financial results for their 1999 second and third quarters. James attempts to plead "fraud by hindsight," alleging that because of the announced restatement, the defendants must have known of the problems at the time they occurred. Such an allegation is clearly insufficient. *See Gross,* 93 F.3d at 991; *Serabian,* 24 F.3d at 367 (allegation that defendants "must have known of the severity of their problems earlier because conditions became so bad later on" is insufficient).

### 2. Absence of "Proper Financial Controls"

■ To support his allegation that Focus lacked or recklessly ignored proper financial controls, James cites the disclosure in Amended 1999 Form 10K that "an accounting manager in the Company's finance department misstated the inventory records of the Company's Pro AV series for purposes of presentation to the Company's outside auditors" for the 1999 audit. (James 2d Am. Compl. ¶ 114.) Defendants contend that, because the Second Amended Complaint states that the misstated inventory records were solely internal and did not impact any financial statements, but rather were replaced by a corrected, audited inventory list for purposes of Focus' 1999 financial statements, James does not allege that "the reported Fiscal 1999 inventory figures failed to comply with GAAP [or] that there was any fraud in said actual inventory reporting." (Def. Mem. Supp. M. Dismiss at 10.)

---

**23.** James states that SAB 101 does not require companies to restate previously issued financial results which were prepared in compliance with GAAP. Moreover, because SAB 101 did not become effective until the fourth quarter of 2000, James contends that Focus need not have "applied" SAB 101 to its second and third quarters of 1999, issued before SAB 101's effective date. (James 2d Am. Compl. ¶¶ 129–130.)

James contends that the accounting manager's misstatement of inventory levels, first, rendered Focus' public assurances misleading, and second, strongly suggests that proper financial controls did not exist because if adequate controls were in place, "improper practices would not have gone unnoticed by defendants." (James Reply at 9.)

James, however, does not allege that the misstatement of inventory levels for the Pro AV line had any impact on Focus' financial statements for fiscal year 1999. Nor could he make such an allegation, because the misstatement was caught and corrected by Focus' outside auditors before publication. As a consequence, this internal misstatement is simply irrelevant.

## B. Scienter

James alleges that defendants knew or should have known that the statements issued about Focus' financial controls were false or materially misleading, because of Focus' "sophisticated" computer system as well as "by virtue of their receipt of information reflecting the true facts regarding Focus, [and] their control over and/or their associations with the Company which made them privy to confidential proprietary information concerning Focus." (James 2d Am. Compl. ¶¶ 48, 126.) James cites the concentration of Focus' sales and defendants' sale of Focus shares during the Class Period as evidence of scienter.

### 1. *Concentration of Focus Sales*

James alleges that the fact that Focus sales were concentrated to one major distributor in each quarter facilitated Focus' ability to monitor and properly reserve for returns and inventory.[24] (James 2d Am. Compl. ¶ 137.) In addition, sales

of Focus Pro AV products increased 205% in 1999 from 1998, and accounted for Focus' only increase in sales during fiscal year 1999. (*Id.* ¶ 138.) James argues that the combination of (1) the concentration of sales to one customer; (2) the importance of the Pro AV line (3) Focus' claim that it monitored its inventory and reserved for returns; and (4) the prior recurrence of "identical problems in this precise area of accounting," creates a strong inference that the defendants "recklessly disregarded the inadequacies of Focus' product return reserves and the obsolescence of its inventory." (*Id.* ¶ 140.) James also contends that Focus recklessly ignored information "which was readily available to it through its 'sophisticated' MIS, which allowed it to track inventory, purchasing, accounting, and monitor sales trends." (*Id.* ¶ 141.)

I note as a preliminary matter that the existence of a sophisticated internal reporting system for sales is, without more, insufficient to establish scienter without a specific allegation of the factual content of a report. *Shaw*, 82 F.3d at 1224 n. 38. Given the prevalence of internal reporting systems, permitting an inference of scienter to arise from the mere existence of a computer system, would "expose all those companies to securities litigation whenever their stock prices dropped." *In re Silicon Graphics*, 183 F.3d at 988. Because James fails to cite any actual sales report generated by Focus' computer system, he cannot rely on the mere existence of a corporate computer to satisfy the scienter requirement.

As for James' argument that the concentration of sales and the emphasis on the Pro AV line should have made it simple for Focus to monitor inventory at the reseller

---

24. In 1999, one customer accounted for 45% of accounts receivable in the first quarter, one customer accounted for 35% in the second quarter, and another customer accounted for 26% in the third quarter. (James 2d Am. Compl. ¶ 137.)

level and maintain adequate reserves, this allegation is simply conclusory in nature and lacks any factual support. Accordingly, it does not give rise to a strong inference of scienter.

■■■■ In response to James' contention that they "recklessly disregarded the inadequacies of Focus' product return reserves and the obsolescence of its inventory," defendants argue that the Form 10–Q identified technological obsolescence as a factor that could affect future results, and so is protected under the "bespeaks caution" doctrine. The "bespeaks caution" doctrine provides that forward-looking statements accompanied by adequate cautionary disclosures are not materially misleading under the securities laws. *See Shaw*, 82 F.3d at 1213; *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F.Supp.2d 1, 19 (D.Mass.1999). The cautionary language, however, must be "sufficiently related in subject matter and strong in tone to counter the statement made." *In re Boston Technology, Inc. Sec. Litig.*, 8 F.Supp.2d 43, 53 (D.Mass. 1998) (citation omitted). The cautionary language used by defendants does not satisfy this test. I find that Focus' "warning" to investors is merely boilerplate, and as such is not sufficiently detailed to fall within the protections of the "bespeaks caution" doctrine. (Defs.App.1.) Nevertheless, I find that James has failed to cite facts with sufficient particularity to create a strong inference that defendants knew or recklessly disregarded that the third quarter 1999 Form 10–Q was misleading.

2. *Insider Trading*

■■■■ As further evidence of the individual defendants' scienter, James alleges that they collectively sold more than 206,959 shares of Focus common stock at artificially inflated prices [25] "shortly after the collapse of the merger negotiations with Faroudja [disclosed on November 11, 1999] and only weeks before the close of the fourth quarter" and the negative announcement made on March 1, 2000. (James 2d Am. Compl. ¶¶ 142, 145.)

Insider sales of stock may give rise to a "strong inference" of scienter if the trades are unusual or suspicious in timing or amount. *See Shaw*, 82 F.3d at 1204. However, "the mere fact that insider stock sales occurred does not suffice to establish scienter." *Id.* at 1224. The plaintiff must allege facts establishing that the trading was "unusual, well beyond the normal patterns of trading by those defendants." *Greebel*, 194 F.3d at 198; *see also Greenstone*, 975 F.2d at 27. Relevant information includes what percentage of each defendant's stock was sold and whether these sales were in keeping with the defendants' prior history of stock sales. *See In re Baan Co. Sec. Litig.*, 103 F.Supp.2d 1, 19 (D.D.C.2000) (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540–41 (3d Cir. 1999)) (court must consider percentage of stock sold, past trading practices, and whether all defendants sold stock); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir.1995) (inference of scienter is weakened where an insider sells only a small percentage of his or her shares).

James provides a chart showing the stock sales activity of Massie and Moyer, indicating that they sold a combined total

---

**25.** Allegedly on the strength of reassurances made in the Amended Form 10–Q filed on November 16, 1999, Focus stock rose over 134% to $2–11/32 on November 19, 1999. By early December, Focus stock was trading at approximately $4 per share, and on January 6, 2000, Focus stock reached a Class Period high of $9–7/32. (James 2d Am. Compl. ¶ 92.)

of more than 206,959 shares of Focus common stock during the Class Period.[26] (James 2d Am. Compl. ¶ 142.) Moyer sold 12,000 shares between November 19 and November 29, 1999, for proceeds of $37,750. (*Id.*) On December 3, 1999, Massie sold 194,959 shares (134,352 of his shares and 60,607 shares on behalf of his family), for proceeds ranging between $1,194,123 and $1,584,041. (*Id.*) During the Class Period, Moyer sold all of his shares in the company, and Massie sold approximately 37% of his holdings and 83% of his family's shares of Focus stock.

Prior to the Class Period, Moyer had not sold any of his shares of Focus stock. (*Id.* ¶ 144.) Massie sold 150,000 shares on June 13 and 14 in 1996, which at the time amounted to approximately 35% of his total holdings. Massie also sold fifty shares on September 17, 1998, the last time he sold Focus shares prior to the Class Period. (*Id.*)

As a preliminary matter, I note that defendant Cebula did not sell any shares of stock during the Class Period, and so the sale of shares by other named defendants does not support a strong inference of scienter on Cebula's part. As to Massie and Moyer, the percentage of shares sold during the Class Period—37% of Massie's holdings, 83% of Massie's family's holdings, and 100% of Moyer's shares—combined with the apparent departure from past trading practices [27] establishes trading that is unusual in amount. The individual defendants argue that the insider

trading was not suspicious in amount because the insider sales constituted only 1.43% of the over twenty million shares of Focus common stock outstanding as of April 2000. James responds, correctly, that the appropriate comparison is between the number of shares traded by insiders and the total amount of shares held by them. Accordingly, I must now consider the timing of the insider trading.

James contends that the insider trading by Massie and Moyer was suspicious in timing because it occurred shortly after the collapse of the merger negotiations with Faroudja and only weeks before the close of the fourth quarter. (James 2d Am. Compl. ¶ 145.) Termination of merger discussions with Faroudja was disclosed to the public on November 11, 1999. (James 2d Am. Compl. ¶ 86.) The first insider sale occurred eight days later, on November 19, 1999, and the bulk of the insider sales did not occur until December 3, 1999—the date of the announcement of a deal between Focus and Intel Corporation.[28] (*Id.* ¶¶ 142–143.) Defendants contend that, because the stock had been trading at around $1, "it is not surprising that when a significant increase occurred in the price of the stock . . . some directors and officers decided to take a profit on their holdings."

The First Circuit has stated that context, including timing, should be examined first, *see Greebel,* 194 F.3d at 206, indicating presumably that timing is more impor-

---

26. James also provides a chart of other insider trading activity during the Class Period. However, without specific facts suggesting that the named defendants intended to manipulate Focus' stock price to assist these insiders, I find no reason to take these transactions into account in considering James' allegation of scienter based on insider trading. *See In re PetSmart, Inc. Sec. Litig.,* 61 F.Supp.2d 982, 1001 (D.Az.1999).

27. Although Massie's sale of 37% of his holdings is roughly in line with his 1996 sale of approximately 35% of his shares, Moyer's sale of 100% of his holdings represented his first sale of Focus stock.

28. James' Second Amended Complaint does not mention the Intel announcement, which was released on December 3, 1999. (Defs.App.2.)

tant than the amount of sales in determining whether a strong inference of scienter is created by insider trading. In this case, the timing of the insider trading does not appear very suspicious. The sales did not occur before a big "event" unknown to the public. *Id.* at 207. Instead, the vast majority of sales occurred after a public announcement that caused stock prices to rise. Thus, despite the unusual amounts traded, I find that, absent additional particularized allegations, it is not possible to draw a strong inference of scienter based on improper insider trading.

### 3. *Additional Evidence of Scienter*

 James alleges that defendants were also motivated to misrepresent Focus' financial condition to avoid defaulting on a lending agreement with Silicon Valley Bank, which provided that Focus would be in default if its debts exceeded the fair value of its assets, and to "portray itself as an attractive investment to investors and creditors." (James 2d Am. Compl. ¶¶ 149–153.)

As I have noted repeatedly, the First Circuit has held that "merely pleading motive and opportunity, regardless of the strength of the inferences to be drawn of scienter, is not enough." However, evidence of motive and opportunity may be relevant in determining whether the plaintiff has alleged facts giving rise to a "strong inference" of scienter. *See Greebel,* 194 F.3d at 197.

In stating that Focus desired to portray itself as an "attractive investment," without setting forth any supporting facts indicating that this involves more than routine corporate transactions, James' allegation is far too generalized to provide a legally sufficient basis for inferring scienter. As for the motive to avoid default on a lending agreement, I find that also lacks sufficient

factual support to create an inference of scienter.

### C. Section 20(a) Violation

Count II of the Amended Complaint alleges that the individual defendants violated § 20(a) of the Exchange Act. Section 20(a) provides a cause of action against any person who "controls" a corporation that violates the securities laws. *See* 15 U.S.C. § 78t(a). As noted above, to state a claim under § 20(a), plaintiffs first must allege an independent violation of the securities laws. *See Fitzer,* 119 F.Supp.2d at 16 n. 2 (citing *Suna,* 107 F.3d at 72).

Because I have determined that James has failed to plead a primary violation of § 10(b) or Rule 10b–5, "secondary 'controlling' person' liability cannot exist." *Peritus Software,* 52 F.Supp.2d at 230.

### V. CONCLUSION

For the reasons set forth more fully above, I DENY the defendants' motion to dismiss the *Ridel* Second Amended Complaint with respect to its allegations of inventory parking and revenue recognition and ALLOW the defendants' motion to dismiss the *James* Second Amended Complaint in its entirety.